**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HAYDEN ELECTRIC, INC., Respondent.**

No. 81–5884.

United States Court of Appeals, Eleventh Circuit.

Dec. 20, 1982.

Elliott Moore, Deputy Associate Gen. Counsel, Carol A. DeDeo, James Y. Callear, Attys., N.L.R.B., Washington, D.C., for petitioner.

Mershon, Sawyer, Johnston, Dunwody & Cole, William R. Radford, Robert T. Kofman, Miami, Fla., for respondent.

Joseph H. Kaplan, Kaplan, Sicking, Hessen, Sugarman, Rosenthal & DeCastro, P.A., Miami, Fla., for intervenor in support of petitioner, N.L.R.B.—Intern. Broth. of Elec. Workers, Local Union 728.

Before RONEY, TJOFLAT and FAY, Circuit Judges.

FAY, Circuit Judge:

The National Labor Relations Board (the "Board") petitions for enforcement of its Decision and Order of June 16, 1981 (the "Order"), 256 NLRB 104, pursuant to section 10(e) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 160(e).[1] The Board, adopting the opinion of the administrative law judge, found that respondent Hayden Electric, Inc. ("Hayden Electric" or "Company") had violated sections 8(a)(1) and 8(a)(5) of the Act,[2] 29 U.S.C. § 158(a)(1) and (a)(5), by refusing to reinstate its former striking employees and by failing to comply with a collective bargaining agreement allegedly negotiated on its behalf by the National Electric Contractors Association, Inc. ("NECA") (Florida East Coast Chapter). Opposing enforcement of the Order, Hayden Electric argues that it permissibly withdrew from NECA and that the International Brotherhood of Electrical Workers, Local 728 (the "Union") consented to or acquiesced in its withdrawal from the multi-employer bargaining unit. Because we do not find substantial support in the record for the Board's holding, but find ample support in the record for the Company's contentions, we set aside the Board's Order and decline to enforce it.

## FACTS

Hayden Electric is an electrical service contractor with its principal office and place of business located in Pompano Beach, Florida. From 1969 to 1975, the Company, either as a member of Florida East Coast Chapter, NECA or through written authorization, commissioned NECA to act as its agent in collective bargaining with the Union. NECA is the multi-employer bargaining unit[3] of the electrical contracting industry, which exists for the purpose of representing its employer-members in negoti-

---

1. Section 10(e) of the Act states in relevant part:

 The Board shall have power to petition any court of appeals of the United States . . . within any circuit . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings . . . .

2. Section 8(a)(5) provides: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with a representative of his employee." Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [of the Act]."

3. "Multi-employer bargaining refers to 'all situations in which two or more independent employers bargain or negotiate jointly, through an agent, committee, or association, with one or more labor organizations representing employees of the several employers, with respect to wages, hours, and terms and conditions of employment.' " *National Labor Relations Board v. Preston H. Haskel Company,* 616 F.2d 136, 137 (5th Cir.1980), *quoting* Rains, Legal Aspects and Problems of Multi-employer Bargaining, 34 B.U.L.Rev. 159, 160 (1954).

ating and administering collective bargaining agreements. NECA regularly negotiated and executed multi-employer collective bargaining agreements with the Union on behalf of its employer-members, including Hayden Electric.

In 1975, the Company resigned from membership in NECA. In 1974, 1975, and 1976, Company owner Bruce Hayden sent a letter to the Union, with a copy to NECA, prior to the expiration of the then current NECA-Union collective bargaining agreement. The letter stated that Hayden Electric intended to exercise its option to cancel its contract with NECA. After each letter, the Company continued to abide by the terms of the then current collective bargaining agreement and to apply the terms of the subsequent labor agreement negotiated between the Union and NECA.

William H. Briley, formerly vice president of Hayden Electric, purchased the Company in May 1977 and became its president. Omitting to forward the customary letter resigning from NECA that year, Briley, the following year, sent a letter to James Weldon, Business Manager of the Union, with a copy to Marshall Williams, the Secretary Manager of NECA. This letter dated April 27, 1978 was similar to those sent in 1974, 1975, and 1976, regarding contract cancellation. The letter read:

> Complying with the requirements of the IBEW 728, this letter is to advise, 150 days in advance, of our intention to exercise our option to cancel our contract with the local union 728.
>
> We find our project bidding hindered and are unable to compete with non-unions paying lower costs and less benefits.
>
> Due to our long standing relationship with the local, we hope economic conditions improve so this option does not have to be finalized.

Following receipt of the Company's letter, Weldon met with Briley in June 1978. Weldon asked Briley what was meant by the letter. Briley explained that he had sent the letter to protect himself from being bound to a new collective bargaining agreement.

On April 27, 1979, Briley sent Weldon a cancellation letter identical to the one he had given the year before. Briley also sent a copy of the letter to Williams. Again Weldon called Briley and arranged a meeting. When they met Briley explained that the letter was sent for the following purpose:

> I told him again that the letter was insurance for Hayden Electric, that under the contract that letter had to be sent. And, that it was protection insurance and that it gave me the right to bargain for myself on a one-to-one ratio with Jimmy [Weldon], and to terminate the contract.

(Tr., Dec. 3, 1980, Vol. I, pg. 288).

During this meeting Weldon asked Briley what wage package would be acceptable to the Company. Briley replied that a fifty cent wage increase would probably be acceptable. Weldon replied that he did not think fifty cents was close to what the Union would be requesting in negotiations. At this meeting Briley requested that a double time provision for overtime in the contract be cut back to time and a half for residential service work.

About a month later, Weldon called Briley and arranged another meeting. They again discussed the collective bargaining agreement and Briley reiterated that a fifty cent wage increase was an acceptable figure. Weldon stated that the figure was much too low and that the Union was talking about a $3.00–4.00 per hour increase. Briley replied that his service truck operation could not live with such a large wage increase. During the discussion Briley again requested that the overtime rate be reduced. Briley also requested that there be a special service truck rate. Weldon asked Briley if he would consider having a shop steward in his shop. Briley replied that his initial reaction was not favorable to the request, but that if Weldon thought he had to do it, he would.

During the month of September, 1979, Weldon called Briley and requested a third meeting. The two met in Briley's office where Weldon indicated that the NECA contract would contain approximately a $2.85 per hour raise. Briley replied that it was much too high an increase for him to live with, but he raised his own offer to $1.25 an hour. Weldon rejected Briley's counter-offer as too low.

Briley attended several of the ongoing bargaining sessions between NECA and the Union. After one such session, Briley met with Williams and Crosley, NECA's attorney, in Williams' office. Briley told the NECA officials that he was not satisfied with the way negotiations were going and he wanted clarification as to the legality and effectiveness of his April letter. Crosley examined the letter and then told Briley, "You are free to go, but be careful." (Tr., Dec. 3, 1980, Vol. I, pp. 400–403).

In late September and early October, Briley attended three or four NECA meetings regarding the ongoing contract negotiations. By September 30, the Union and NECA negotiated a "cooling off" period of ten days to follow the expiration of the 1978 collective bargaining agreement. By October 10, no agreement had been reached, and the Union called a general strike against all the employers represented by NECA, including Hayden Electric. On November 3, 1979, the Union's membership ratified the terms of a new agreement. Weldon sent a mailgram to Briley the same day offering the immediate return to work of the Union's members and requesting further discussions of the dispute concerning the "state of contractual relations." The Company's employees were directed to report to work on Monday, November 5.

On November 7, Briley and Weldon met to discuss the November 3 offer to return to work. It was during this meeting that Weldon first informed Briley that he believed the Company's April 1979 termination letter was defective and had not withdrawn bargaining authority from NECA.

Other issues discussed at the November 7 meeting included overtime and a special service truck rate. Weldon offered to take any journeyman electricians Hayden Electric had hired as strike replacements into the Union. At Weldon's request the two met again on November 15, 1979. During this meeting Weldon offered not to bring the two Union members Briley still had working for him up on intra-union charges for working for a non-union contractor. Again at this meeting Weldon and Briley discussed overtime and a special service truck rate.

Weldon met with Briley for the final time on December 15, 1979. At this meeting Weldon asked Briley whether he was going to pay his employees for the ten day "cooling off" period. Briley responded that the matter was under consideration. Weldon also asked whether Briley would pay fringe benefits for that period of time. Briley responded that he would.

In addition to the post-strike meetings between Briley and Weldon, Weldon sent five different written documents to Briley regarding the status of Hayden Electric and the Union's contractual relationship. The first such document was the mailgram sent on November 3, described earlier. The second written document was a letter dated November 7, 1979. The third written correspondence from Weldon was a letter dated January 16, 1980, informing Briley that Hayden Electric was in arrears for fringe benefit contributions due Union employees for the ten day cooling off period. The January 16 letter read as follows:

> In checking our records, we find that you have not paid the fringe benefits due the employees you terminated and replaced with non-union people, for the month of October, 1979.

> At our last negotiations meeting, it was my understanding that payment of the above mentioned fringes was under consideration and I requested that you present some type of a counter proposal concerning our negotiations.

To date this has not occurred. I would appreciate hearing from you in this regard as soon as possible.

Weldon's next written communication is a letter dated March 6, 1980, written shortly after the Board's Regional Office dismissed an unfair labor practice charge filed against Hayden Electric by the Union. It read as follows:

In view of the recent NLRB decision, I would like to schedule another negotiating meeting with you. Please contact me so that we may arrange a suitable time and place.

Between November 5, 1979, and December 2, 1980, the date of the hearing for the unfair labor practice charges, Hayden Electric hired ten additional replacements for its former employees. The Company paid some of the replacement employees at a lower rate than the rate established in the expired agreement. It paid the other replacement workers at the expired agreement rate. Hayden Electric did not pay any at the higher rate established in the new labor agreement. The Company also unilaterally established different benefits, such as a major medical plan and incentive wage increases for its strike replacements, and unilaterally discontinued its contributions to the Union's fringe benefits fund.

## DISCUSSION

■ The Board's decision that Hayden Electric violated sections 8(a)(1) and 8(a)(5) of the Act, with respect to both the constructive discharge of striking employees and the refusal to comply with the collective-bargaining agreement, flowed from its finding that Hayden Electric's attempted withdrawal from NECA on April 27, 1979 was ineffective. After reviewing the entire record, we hold that the Board's finding of unfair labor practices is not supported by substantial evidence.[4] The burden of showing that the evidence is insufficient to sup-

4. The role of this court in reviewing the Order of the Board is to determine whether the Board's decision is supported by substantial evidence on the record as a whole. *Johns-Manville Products Corp. v. N.L.R.B.*, 557 F.2d 1126, 1132 (5th Cir.1977). "This [c]ourt has the utmost respect for findings and conclusions of the Board, but recognizes that their judgment is not the last word." *Id.* As the Supreme Court stated in *N.L.R.B. v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965):

It is argued, finally, that the Board's decision is within the area of its expert judgment and that, in setting it aside, the Court of Appeals exceeded the authorized scope of judicial review. This proposition rests upon our statement in *Buffalo Linen* [*Labor Board v. Truck Drivers Union,* 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957)] that in reconciling the conflicting interests of labor and management the Board's determination is to be subjected to 'limited judicial review.' 353 U.S., at 96 [77 S.Ct. 643 at 648]. When we used the phrase 'limited judicial review' we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f) .... Courts should be "slow to overturn an administrative decision," *Labor Board v. Babcock & Wilcox Co.,* 351 U.S. 105, 112 [76 S.Ct. 679, 684, 100 L.Ed. 975], but they are not left "to 'sheer acceptance' of the Board's conclusions," *Republic Aviation Corp. v. Labor Board,* 324 U.S. 793, 803 [65 S.Ct. 982, 988, 89 L.Ed. 1372]. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co. v. Labor Board,* [380 U.S. 300, 318, 85 S.Ct. 955, 957, 13 L.Ed.2d 855 (1965) [footnote citation omit-

port a finding of unfair labor practices is not as heavy, since the Board's subsidiary, but conclusive, finding of ineffective withdrawal is predicated on its interpretation of written evidence.[5]

In finding ineffective withdrawal of NECA bargaining authority, the Board relied on three writings. On February 28, 1978, Briley, on behalf of Hayden Electric, executed two separate documents with the Union. These documents, commonly referred to as "letters of assent," were bargaining authorizations from Hayden Electric to NECA; they authorized NECA to bargain on the Company's behalf with the Union.[6] Both letters of assent require the Company to give the Union and NECA notice of its intent to withdraw NECA's bargaining authority at least 150 days prior to the expiration of the 1978 collective bargaining agreement. Accordingly, prior to the expiration of the 1978 labor agreement, Briley sent a cancellation letter to the Union, and a copy of same to NECA. This letter dated April 27, 1979 read as follows:

> Complying with the requirements of the IBEW LU 728, this letter is to advise, 150 days in advance, of our intention to exercise our option to cancel our contract with the [sic] local union 728.

We find our project bidding hindered and are unable to compete with non-union shops paying lower labor costs and less benefits.

Due to our long-standing relationship with the local, we hope economic conditions improve so that this option does not have to be finalized.

The Board found that Briley's April 27, 1979 letter was ambiguous and did not give the Union and NECA sufficient notice of the Company's intent to revoke NECA's authority to bargain on its behalf. We disagree.

The Board in *Retail Associates, Inc.,* 120 NLRB 388 (1958), prescribed guidelines to govern withdrawal from multi-employer bargaining. Under these rules, an employer or union is free to withdraw from a multi-employer association for any reason prior to the date set for renegotiation of an existing contract or the date on which negotiations actually commence, provided adequate written notice is given. Once negotiations towards a new contract begin, however, a party may only withdraw if "mutual consent" is given or if "unusual circumstances" exist. *Id.* at 396. "This approach

---

ted]. 380 U.S. 278, 290–92, 85 S.Ct. 980, 987, 13 L.Ed.2d 839.

**5.** We note as a caveat that where some or all of the evidence was not the live testimony of witnesses, but instead consisted of written documents reviewed and relied upon by the administrative law judge and the Board in their finding of ineffective withdrawal of NECA's bargaining authority, the rules limiting appellate review of Board's decisions and orders will not apply with full force. In such instances, the appellate court is in as good a position as the administrative law judge or Board to evaluate the evidence that is crucial to the case and draw its own inferences therefrom. *See Jurek v. Estelle,* 623 F.2d 929, 932 (5th Cir.1980); *Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 593 (5th Cir.1967); Wright & Miller, Federal Practice and Procedure § 2587.

**6.** An employer becomes bound by the terms of a collective bargaining agreement by becoming either a member of NECA or by signing a form of "letter of assent." In this instance, Briley signed two such forms, one pertaining to "inside work", and the other to "residential

work". The forms, other than referring to different collective bargaining agreements, were identical. For the sake of brevity, it is appropriate to quote from only the "inside work" assent form:

> In signing this Letter of Assent, the undersigned firm does hereby authorize FLORIDA GOLD COAST CHAPTER, N.E.C.A., INC. as its collective bargaining representative for all matters contained in or pertaining to the current approved INSIDE WORKMAN labor agreement between the FLORIDA GOLD COAST CHAPTER OF N.E.C.A., INC. and LOCAL UNION 728, I.B.E.W. This authorization, in compliance with the current approved labor agreement shall become effective on the 1st day of October, 1977. It shall remain in effect until terminated by the undersigned employer, giving written notice to the FLORIDA GOLD COAST CHAPTER, N.E.C.A., INC. and to the LOCAL UNION at least one hundred fifty (150) days prior to the then current anniversary date of the aforementioned approved labor agreement.

affords each party an opportunity to rescind its consent to multi-employer bargaining, but limits unilateral withdrawal during the period when such action would jeopardize the viability and effectiveness of the bargaining process. Even then, however, a necessary measure of flexibility is provided by the 'mutual consent' and 'unusual circumstances' exceptions." *NLRB v. Charles D. Bonanno Linen Service,* 630 F.2d 25, 28–29 (1st Cir.1980). "This standard has won judicial approval." *NLRB v. L.B. Priester & Son, Inc.,* 669 F.2d 355, 360 (5th Cir.1982).[7]

There is no question that Briley's April 27, 1979 letter was timely. Perplexing, however, is the administrative law judge's determination that the letter was "ambiguous ... and provid[ed] nothing enlightening by its terms to indicate the Company's desire to withdraw NECA's bargaining authority." The terms of the cancellation letter become dispositive of the issue of withdrawal when read in conjunction with the letters of assent executed by Hayden Electric in February, 1978. The letters of assent specifically provide that NECA's bargaining authority "shall remain in effect until terminated by [Hayden Electric], giving written notice to ... NECA, and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the ... labor agreement." Briley's letter of April 27 to the Union and NECA makes specific reference to the letters of assent when it states, "[c]omplying with the IBEW LU 728, this letter is to advise, 150 days in advance, of [the Company's] intention to exercise [its] option to cancel [its] contract with the local union 728." The only reasonable construction that can be given this statement, in light of the requirements for revoking NECA's bargaining authority set forth in the letters of assent, is that it was a statement noticing the Company's intent to revoke NECA's bargaining authority. We refuse to construe the statement in any other manner, because to do so would disregard the literal meaning of the terms of the April 27 correspondence and the referenced letters of assent.[8]

In finding ineffective withdrawal, the Board relied heavily on Briley's admission

7. *See, e.g., N.L.R.B. v. Marine Machine Works,* 635 F.2d 522 (5th Cir.1981); *Baton Rouge Building and Construction Trades Council v. E.C. Schafer Construction Co.,* 657 F.2d 806 (5th Cir.1981); *Johns-Manville Products Corp. v. N.L.R.B.,* 557 F.2d 1126 (5th Cir.1977); *N.L.R.B. v. Charles D. Bonanno Linen Service,* 630 F.2d 25 (1st Cir.1980); *N.L.R.B. v. Custom Sheet Metal & Service Co.,* 666 F.2d 454 (10th Cir.1981); *Authorized Air Conditioning Co., Inc. v. N.L.R.B.,* 606 F.2d 899 (9th Cir.1979).

8. We reject the Board's contention that the Company's past practice of sending letters revoking NECA's bargaining authority while continuing participation in the collective bargaining process permitted the Union and Board to construe the Company's April 27, 1979 correspondence as entirely consistent with the Company's continued participation in the multi-employer bargaining unit. It is undisputed that in 1974, 1975, and 1976, Hayden Electric sent letters to the Union noticing the Company's intent to withdraw NECA's authority to bargain on its behalf and, in each instance, adopted and adhered to the terms of the new collective bargaining agreement. Similarly, in 1978, the Company sent a letter revoking NECA's bargaining authority; yet, when the 1978 labor agreement was consummated, the Company adopted it and complied with all of its terms

and provisions. The Company's prior practices of becoming a "me too" signatory to the NECA-Union collective bargaining agreements did not permit the Board or the Union to presume that the Company was going to continue its participation in NECA when the Company sent its April 27 cancellation notice to the Union and NECA. The Board agrees that it is perfectly legal and an established practice in the construction industry for an employer to withdraw from the multi-employer bargaining process and later adopt the collective bargaining agreement resulting from such process; and, the union would not be required to give the employer the terms of the collective bargaining agreement, but could hold the employer to more stringent terms since the employer did in fact withdraw from the collective bargaining process. This practice of employers becoming "me too" signatories to collective bargaining agreements consummated after their withdrawal from group bargaining has been widely used in the construction industry and sanctioned by the Board. *See Ruan Transport Corporation,* 234 NLRB 241 (1978); *Phoenix Air Conditioning,* 231 NLRB 341 (1977).

Moreover, the Board has specifically held on numerous occasions that an employer does not become a part of a multi-employer bargaining group where it merely adopts a collective bargaining agreement in the negotiation of which

that the April 27 letter was to serve as "insurance" to protect the Company in the event that NECA's bargaining resulted in a Union strike or in a labor agreement that was not in the Company's best interest. The Board's determination that this admission makes apparent the equivocating and ambiguous tenor of the April 27 letter to the Union is unfounded. We read Briley's reference to the April 27 letter as "insurance to preserve the Company's right to negotiate separately with the Union" as indicating a clear, convincing, and unequivocal intent to withdraw from the multi-employer bargaining unit.

As urged by the Board throughout this litigation, once Hayden Electric executed the letters of assent authorizing NECA to bargain on its behalf with the Union, it was obligated to adhere to the eventual labor agreement resulting from the collective bargaining process. The only way Hayden Electric could negotiate separately with the Union was to timely withdraw from NECA. Absent such withdrawal, the Company had no right to bargain individually with the Union. The only way the April 27 letter could insure the Company's right to negotiate separately with the Union is if the correspondence, in accordance with the terms of the letters of assent, advised the Union and NECA of the Company's intent to withdraw NECA's bargaining authority. Thus Briley's admission that the letter was insurance to preserve his right to bargain individually with the Union can only evidence the Company's intent to revoke NECA's bargaining authority and to give notice of such intent through its April 27 correspondence.

■ Not only did Hayden Electric give sufficient notice of its intention to withdraw bargaining authority from NECA, but we conclude that the evidence of record shows that the Union consented to or acquiesced in the Company's withdrawal from the multi-employer bargaining unit. It is well-established that a union's acquiescence in or implied consent to an employer's untimely or ineffective withdrawal will excuse that employer's subsequent refusal to honor a bargaining agreement negotiated by the union and the multi-employer association. *NLRB v. Callier,* 630 F.2d 595 (8th Cir. 1980); *Fairmont Foods Co. v. NLRB,* 471 F.2d 1170 (8th Cir.1972); *NLRB v. Spun-Jee Corporation,* 385 F.2d 379 (2d Cir.1972). The Board in I.C. Refrigeration Service, 200 NLRB 687, 690 (1972), enunciated the test

it did not actually participate. The comments of the Board in *Ruan Transport Corporation* are particularly appropriate:

> At this point in our Decision, we note that a multiemployer unit, unlike other types of bargaining units, is consensual in nature. The Board has consistently held that 'the essential element warranting the establishment of multiple employer units is clear evidence that the employers unequivocally intend to be bound in collective bargaining by group rather than by individual action. The correlative standard for excluding an employer from such a unit is evidence of an intent to pursue an individual course of action with respect to labor relations. As a general rule, the Board has found that an employer does not become a part of a multiemployer bargaining group (i.e., it does not intend to be bound by group bargaining) where it merely adopts a collective bargaining agreement in the negotiation of which it did not actually participate and which it did not authorize another to negotiate on its behalf.
> We agree with the Administrative Law Judge that the 'one bargaining unit' provision is not the model of clarity. However, *assuming arguendo* that the provision was clearly written and unambiguous, we find that such a bare covenant by the Respondent by which it agreed to be a part of a multiemployer bargaining group does not itself suffice to clearly demonstrate that the Respondent delegated authority to the Council to represent it in future negotiations with the Union. The most that can be said for the 'one bargaining unit' provision is that it perhaps *implicitly* authorized the Council to represent the Respondent in the 1976 negotiations. However, we find that something in addition to a mere implied delegation of authority is needed in order to constitute *clear* evidence of an *unequivocal* intent on the part of an employer to be bound by group bargaining. We would require, for example, some conduct on the part of the employer which indicated that it actually pursued a group course of action with regard to labor relations.

234 NLRB at 242 (emphasis in original).

for determining whether a union has consented to an untimely withdrawal:

> Where a union expresses its willingness to meet and discuss terms peculiar to an individual employer's operation, and listen to counter proposals, the Board has found that such conduct evidences acquiescence in an otherwise untimely withdrawal, even though the union ultimately insisted that the employer could sign only the association contract.

In the instant case, the facts clearly show that the Union engaged in direct negotiations with Hayden Electric after receipt of the Company's April 27 withdrawal notice. Weldon, on behalf of the Union, met on several occasions with Briley and discussed substantive contract issues such as overtime pay and a special service contract rate. The parties also discussed wage package and overtime problems, and the possibility of the Company contributing welfare fund payments for a certain designated period. Particularly enlightening is Weldon's own testimony at trial regarding the way the meetings with Briley were proceeding:

> I find it very frustrating that not once has Briley maintained any position, other than to just say that he can go on to NECA meetings, and this and that, and: Yes, I am going to go non-union. I am sorry you went on strike, and so now I am going to go non-union. He has never lived up to his responsibilities in any way, shape, or form. If it was his intention that he had cancelled properly the bargaining rights of NECA, he had never bargained. I said: So, I don't know what you are doing Bill. You have got me very frustrated and upset, and what have you. Now if nothing else, you ought to start giving me some proposals and doing something. You have done nothing... I asked him at some subsequent meeting, would he come up with some kind of proposals and I would do whatever I thought was appropriate with them, but he had never given me any proposals, not once. That was going on for about two months then.

(Tr., Dec. 3, 1980, Vol. I, p. 93).

Thus, Weldon's own admissions at trial, along with the types of issues raised and discussed during his post-April 27 meetings with Briley, indicate the Union's willingness to meet and discuss terms peculiar to the Company's operation and to listen to counter proposals. Further evidence of individual bargaining between the Union and Hayden Electric is found in Weldon's letters to Briley. On November 3, 1979, on behalf of the striking employees, Weldon sent Briley an offer to return to work. Nowhere in the mailgram was it stated that the Union considered Hayden Electric to be bound to the collective bargaining agreement negotiated by NECA. Rather, the mailgram indicated that the Union wanted to engage in further negotiations:

> Local 728, International Brotherhood of Electrical Workers offers to return to work immediately and to discuss dispute with you concerning the state of contractual relations. Please call undersigned to make arrangements.

The theme of individual bargaining is carried out in Weldon's next written communication to Briley. In a letter dated January 16, 1980, Weldon again solicits counter proposals from Briley while failing to indicate his belief that Hayden Electric was bound to the new labor agreement:

> In checking our records, we find that you have not paid the fringe benefits due the employees you terminated and replaced with non-Union people, for the month of October 1979.

> At our last negotiations meeting, it was my understanding that payment of the above-mentioned fringes was under consideration and I requested that you present some type of a counter proposal concerning our negotiations.

> To date this has not occurred. I would appreciate hearing from you in this regard as soon as possible.

By letter dated March 6, 1980, which was shortly after the unfair labor practice charge was dismissed by the Regional Office, Weldon requested further negotiations with Briley without stating the Union's belief that Hayden Electric was bound to the NECA-Union agreement:

> In view of the recent N.L.R.B. decision, I would like to schedule another negotiat-

ing meeting with you. Please contact me so that we may arrange a suitable time and place.

The above-quoted letters are proof positive that Weldon was engaged in serious bargaining with Briley.[9] It may be, as urged by Weldon throughout this litigation, that he believed Briley was not being responsive in the collective-bargaining process. This belief, however, does not discount the rather obvious attempt by the Union to engage in separate negotiations with Hayden Electric. Under the test set forth in *I.C. Refrigeration,* it is clear that the Union consented to or acquiesced in the Company's withdrawal from NECA.

For these reasons, we conclude that the Board's findings that Hayden Electric failed to give a timely unequivocal notice of withdrawal to the Union and that the Union did not consent to or acquiesce in the ineffective withdrawal are not supported by the record. Consequently, we hold that Hayden Electric's withdrawal from NECA on April 27, 1979 was effective, and its constructive discharge of striking employees along with its refusal to comply with the 1979 collective-bargaining agreement

did not violate §§ 8(a)(5) and 8(a)(1) of the Act.

Enforcement DENIED.

---

9. The Union has argued and the Board has held that the post-April 27 discussions between Weldon and Briley did not rise to the level of bargaining or negotiations. This determination was made even though the Union representative characterized the discussions as "negotiations" in his numerous correspondence to the Company president. Enigmatically, the Board seems to take the position that neither Weldon nor Briley actually meant or intended what they said or did—the Union did not intend to bargain or negotiate separately with Hayden Electric even though the Union representative expressly acknowledged its intent to do so on more than one occasion, and the Company did not intend to withdraw NECA's bargaining authority when its president sent the Company's April 27 withdrawal notice. Out of necessity, the courts and other quasi-judicial bodies legally presume that people normally intend what they say or do. We see no reason why this legal presumption should not operate in this instance. Further, we find not a scintilla of evidence in the record that would rebut this presumption and sustain the Board's determination that neither party actually meant what they said or did.

Moreover, in the instant case, the Board appears to apply the rules governing withdrawal from multi-employer bargaining in an incongruous fashion. The Company president is inexperienced in the rules governing collective bargaining and operating without the aid of legal counsel. The Board applies the rules of withdrawal in a strict and mechanical fashion and holds the Company president to the highest standard of legal craftsmanship in drafting his withdrawal notice. Conversely, the Union Business Agent is a professional in the field of labor relations and has dedicated his professional career to understanding the nuances of collective bargaining. The Board holds him to a lesser standard. The Union representative is permitted to make assertions in writing that he is engaged in negotiations and soliciting counter proposals, yet the Board determines that he mischaracterizes his activities and fails to understand what constitutes bargaining or negotiations. Although we are unwilling to hold, as a matter of law, that the application of the rules governing withdrawal from multi-employer bargaining in this manner is impermissible, we do recognize the unfairness of such an approach and fail to sanction it in this instance.