In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3206

CONTEMPO DESIGN, INC.,

Plaintiff-Appellee,

v.

CHICAGO AND NORTHEAST ILLINOIS DISTRICT
COUNCIL OF CARPENTERS,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 4513--James F. Holderman, Judge.

Argued March 30, 1999--Decided August 31, 1999

 Before RIPPLE, DIANE P. WOOD, and EVANS, Circuit
Judges.

 EVANS, Circuit Judge.  Contempo Design, Inc. sued
a union, the Chicago and Northeast Illinois
District Council of Carpenters, under sec. 301 of
the Labor Management Relations Act for a
declaratory judgment that the parties' contract
had not been terminated and for breach of that
contract's no-strike provision. Upon Contempo's
motion for summary judgment, the district court
declared that the contract was not terminated.
The court then held a 2-day bench trial on the
issue of damages. At the close of trial, Contempo
was awarded over $450,000 in damages. The Union
appeals.

 Contempo Design, Inc. is in the business of
constructing, setting up, taking down, and
storing exhibits and displays for conventions and
trade shows. In the course of this business
Contempo employs numerous carpenters. The Chicago
and Northeast Illinois District Council of
Carpenters represents Contempo's carpenters. In
the 1970's Contempo and the Union entered into a
standardized contract commonly known as a hard
card or "me too" agreement. Through the hard card
the parties agreed to adopt and be bound by the

then-current collective bargaining agreement (CBA) between the Union and the Woodworkers Association of Chicago, a trade association representing carpentry employers. The parties also agreed to be bound by any subsequent CBAs negotiated by the Union and the Woodworkers Association unless either party notified the other in writing of an intention to terminate at least 3 months before the expiration of the current CBA. Contempo has never been a member of the Woodworkers Association. The hard card allowed Contempo to piggyback on the collective bargaining of the Association, whose interests were aligned with its own, and saved the company the considerable cost of doing its own bargaining with the Union.

In 1993 the Woodworkers Association and the Union entered into a CBA covering June 1, 1993, to May 31, 1995. Contempo and the Union were bound by this CBA pursuant to the hard card. Neither party notified the other of a desire to amend or terminate the hard card at least 3 months prior to the May 31, 1995, expiration of the Woodworkers Association CBA.

On February 27, 1995, the Woodworkers Association attorney, Karl W. Grabemann, wrote to the Union president to inform him that the 15 members of the Woodworkers Association had decided to withdraw collective bargaining authorization from the Association and negotiate separate contracts with the Union. After a series of negotiations Grabemann and the Union ended up drafting a new CBA anyway, and all 15 members of the Association signed the CBA on May 31, 1995. The new CBA covered June 1, 1995, to May 31, 2000. It was the Union's practice to send Contempo a copy of each new Woodworkers Association CBA after negotiations were complete. The Union never sent Contempo a copy of the 1995 CBA.

Instead, the Union notified Contempo and several other exhibit/display employers in early June 1995 that it wanted to negotiate new collective bargaining agreements with them. Until that time the Union and Contempo had never engaged in collective bargaining. The Union gave Contempo a proposed new contract and threatened a "work action" if Contempo did not sign it by June 9. Contempo and the other exhibit/display employers retained Grabemann to represent them, in part because of his expertise in negotiating with the Union on behalf of the Woodworkers Association. Grabemann informed the Union in mid-June that he would attempt to negotiate a single new agreement for the exhibit/display employers. The parties

began negotiating on June 12. The negotiations did not go well. On June 17 Grabemann realized for the first time that the exhibit/display employers' hard card agreements with the Union had never been terminated. He promptly broke off negotiations with the Union.

On July 28, 1995, Contempo and the other affected exhibit/display employers filed an unfair labor practices charge with the National Labor Relations Board against the Union for refusing to recognize that the employers were covered by the 1995 Woodworkers Association CBA through their hard card agreements with the Union. On November 30, 1995, the NLRB Regional Director held that whether the parties were covered by the 1995 CBA was irrelevant to Contempo's unfair labor practices charge. Without reaching the CBA issue, she determined that the Union had not engaged in unfair practices. The NLRB Office of the General Counsel affirmed the Regional Director's decision on June 14, 1995, but again did not reach the CBA issue.

Meanwhile, on March 4, 1996, the Union struck Contempo for 2 days. Contempo had no prior notice of the strike. The parties began negotiating immediately and reached a collective bargaining agreement on March 6 that included wage and benefit increases (the "Contempo CBA"). Contempo reserved its right to seek redress in the courts for what it considered an illegal strike.

In June 1996 Contempo and four other exhibit/display employers filed this action in the Northern District of Illinois pursuant to sec. 301(a) of the Labor Management Relations Act. 29 U.S.C. sec. 185(a). They asked for a declaratory judgment that the 1995 Woodworkers Association CBA applied to them. Contempo sued for breach of contract damages, claiming that the Union's strike violated the no-strike provision in the 1995 Woodworkers Association CBA. The district court granted summary judgment on the first claim, declaring that the 1995 CBA applied to the employers and the Union. The court also held that the Union breached the 1995 Woodworkers Association CBA when it struck Contempo. At this point all the employers except Contempo settled with the Union.

Contempo and the Union went to battle before the judge to resolve three issues relevant to this appeal:

1. What was the duration of the Contempo Strike, and what damages, if any, were caused by the

Strike?

2. Was the Contempo CBA void and unenforceable ab initio because it was signed under duress?

3. If the Contempo CBA was void and unenforceable ab initio because it was signed under duress, what damages, if any, were suffered by Contempo since June 1, 1995?

The district court held that the strike lasted 2 days and awarded $11,574.48 to Contempo to compensate the company for the cost of the strike--basically wages paid for the 2 strike days plus overtime paid to make up for the work missed during those 2 days. The court found that Contempo had not signed the Contempo CBA under duress. But the court also found that but for the Union's unlawful strike Contempo would never have signed the Contempo CBA, making it void ab initio. The court then went on to award Contempo the difference between the wages and benefits it paid its employees under the Contempo CBA and the wages and benefits it would have paid under the 1995 Woodworkers Association CBA. This added a total of $433,139.39 to Contempo's take. Finally, the court awarded $6,300.11 in prejudgment interest at 8.5% for a grand total of $451,013.98 in damages.

On appeal, the Union argues first that the district court erred by granting summary judgment to Contempo because the parties were not covered by the 1995 Woodworkers Association CBA when the Union struck. In the alternative the Union argues that even if the 1995 Woodworkers Association was in effect, the unlawful strike does not make the newly negotiated Contempo CBA void ab initio without a finding that the Contempo CBA was signed under duress. Therefore the difference in wages and benefits between the 1995 Woodworkers Association CBA and the Contempo CBA is not a proper measure of damages.

We review the district court's grant of summary judgment de novo. See Schaefer v. Goch, 153 F.3d 793 (7th Cir. 1998). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The district court's calculation of compensatory damages is reviewable for abuse of discretion. See FTC v. Febre, 128 F.3d 530, 534 (7th Cir. 1997).

Despite the scent of labor law that lingers in

the background, this case is at core a contract dispute. Our first issue is whether the parties were still bound by the 1995 CBA when the Union went on strike. The issue is critical because the CBA contains a strict no-strike clause, and a violation of that clause entitles Contempo to damages.

The original Contempo-Union agreement provides:

2. The parties adopt, and the EMPLOYER agrees to be bound by the terms and conditions of [the current] Collective Bargaining Agreement . . . between the UNION and [the Woodworkers Association] as bargaining agent for their members . . . .

. . . .

4. [T]he parties specifically adopt any agreement entered into between the UNION and [the Woodworkers Association], bargaining agent for their members, subsequent to the expiration date of the agreement adopted by reference as aforesaid, unless notice of termination or amendment is given in the manner provided herein.

5. Either party desiring to amend or terminate this agreement must notify the other with an acknowledgment in writing, at least three calendar months prior to the expiration of the then agreement adopted by reference.

The Union first argues that a change in the composition of the Woodworkers Association made incorporating the 1995 Woodworkers CBA into the Contempo hard card agreement impracticable. The Restatement of Contracts provides:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts sec. 261 (1977). The Union argues that both parties assumed when they bound themselves to future CBAs negotiated by the Union and the Woodworkers Association that the Woodworkers Association would continue to operate as a representative for a multi-employer bargaining unit. When the 15 Association members withdrew from collective

bargaining in early 1995 the potential arose that there would be multiple conflicting contracts between the Union and the Association members. Thus, there would be no single CBA for the Union and Contempo to incorporate into their hard card agreement. Such a state of affairs would have been a compelling argument for impracticability. But the fact of the matter is that such a state of affairs did not come to pass. The Woodworkers Association counsel, Grabemann, negotiated a new CBA with the Union and all 15 members signed off on it. This single CBA was therefore clearly incorporated by the language of the original Contempo-Union agreement, and there is nothing impracticable about Contempo and the Union continuing their "me too" approach which binds them to the terms that the Union and the Association negotiated.

The Union also argues that the conduct of the parties manifested an intention to waive the untimely termination notice of their agreement and negotiate for a successor agreement. The agreement requires either party wishing to terminate to notify the other in writing at least 3 months prior to the expiration of the then-current Woodworkers Association CBA. The Union admits that it did not send any termination notice before the 1993 Woodworkers Association CBA ran out on May 31, 1995, but argues that Contempo waived timely notice when it began negotiating with the Union for a new agreement. Courts must strictly enforce the terms of collective bargaining agreements when those terms are unambiguous. See Young v. North Drury Lane Prods., Inc., 80 F.3d 203, 205 (7th Cir. 1996). The termination provision is unambiguous. The Union, however, cites cases that stand for the proposition that conduct by a party may act to waive strict compliance with an automatic rollover provision in a CBA. See NLRB v. Hayden Elec., 693 F.2d 1358 (11th Cir. 1982); NLRB v. Callier, 630 F.2d 595 (8th Cir. 1985); Allied Indus. Worker, Local Union 770 (Hutco Equip. Co.), 285 NLRB 651 (1987); Hassett Maintenance Corp. (Service Employees Int'l Union, Local 200), 260 NLRB 1211 (1982).

According to the Union, four specific actions by Contempo added up to a waiver: (1) a June 14, 1995, letter from Contempo's attorney to the Union requesting negotiations for a new deal; (2) a June 28, 1995, letter to the Union where the attorney reiterated Contempo's desire to negotiate a new agreement; (3) a July 12, 1995, negotiation session at which Contempo and other display/exhibit employers expressed their belief that they and the Union should negotiate a

separate agreement to specifically meet the needs of display/exhibit employers; and (4) meetings between Contempo and the Union on July 12 and 17 where they continued to negotiate the proposed agreement. The Union argues that when it first proposed a new agreement to Contempo on June 9, 1995, it was clear to Contempo that the Union wanted to terminate the old agreement. Thus Contempo, through it's willingness to negotiate in June and July, waived the Union's failure to file a timely written termination notice before the 1993 Woodworkers Association CBA ran out.

None of the actions that the Union says constitute a termination or waiver, however, took place before the 1995 Woodworkers Association CBA was signed. In fact, neither the Union nor Contempo made any attempt to terminate before June 1, 1995. Therefore, the "me too" agreement automatically operated to bind Contempo and the Union to the 1995 CBA at the moment that agreement became effective on June 1, 1995. Contempo argues and the district court agreed that this pretty much ends the inquiry. And the cases the Union cites support this position. In each of the cases, waiver was found only where one party attempted to terminate and the other waived the noncompliance with termination formalities before the automatic adoption of the successor agreement. In our case, however, because the 1995 CBA had already become effective, there was a valid agreement in place when the parties commenced their efforts to negotiate a new deal in June 1995. When the negotiations went nowhere, the original deal remained in place. The no-strike provision remained in place as well, and the Union strike at Contempo in spring 1996 was a breach of contract.

The four actions in June and July of 1995 cited by the Union certainly indicate a willingness on Contempo's part to mutually negotiate a new agreement or modify the existing one. The Union complains that Contempo tested the waters of negotiations first but then pulled the plug when the negotiations were going badly and decided to stick with the original agreement. This is probably exactly what Contempo did, but we're not sure what's wrong with it. The fact of the matter is that as of June 1, 1995, the parties were bound by the terms of the 1995 Woodworkers Association CBA. If they wanted to mutually negotiate amendments to that deal or scrap it altogether, they were free to do so. But after initial negotiations Contempo simply decided that amending or scrapping the 1995 CBA that was already in force was not in its best interests.

The Union also argues estoppel. According to the Union, it detrimentally relied on statements Contempo made at the July 12, 1995, negotiation session which implied that the 1995 CBA did not apply to display/exhibit employers. Thus, believing that the display/exhibit "me too" employers like Contempo would not be covered by the 1995 CBA, the Union negotiated a deal with the Woodworkers Association that did not take into account the Union's specific concerns about display/exhibit employers. There's one slight problem with this argument: the 1995 CBA was negotiated in May 1995 and signed on May 31 before the July 12 meeting with Contempo. Absent psychic powers, the Union could not have known (or relied upon) July 12 Contempo statements when it was negotiating with the Woodworkers Association in May.

The Union explains at length how the 1995 CBA shows that the Union assumed during its negotiations with the Woodworkers Association that the exhibit/display employers' hard card agreements would be invalidated. We have no trouble believing that the Union made this assumption. It just happened to be wrong, and that is no fault of Contempo's. If the Union wanted to terminate the hard card agreements and negotiate new terms with Contempo and the other exhibit/display workers it was free to do so. But neither party made any effort to terminate, and by the plain terms of their agreement Contempo and the Union became bound by the 1995 Woodworkers Association CBA when it went into effect on June 1, 1995.

Contempo and the Union were still bound by the 1995 CBA when the Union struck Contempo in March 1996, and the strike was a clear breach of the unambiguous no-strike clause. The only remaining issue is the appropriate remedy for this unlawful strike.

The district court found that the Union's wrongful strike made the Contempo CBA that the parties negotiated during the strike void ab initio. Under the general principles of contract law, there are a few flaws in the formation of a contract that make it void from the start. These include lack of consideration, mutual mistake, duress, misrepresentation, and the mental incompetence of a party. Of these doctrines only duress is potentially applicable to the formation of the Contempo CBA. Accordingly, the parties and the district court agreed that a major issue at

trial would be whether the Contempo CBA was void ab initio because Contempo signed it under duress. And at the conclusion of the trial, the district judge decided that Contempo did not act under duress. Despite this finding, he also decided that the Contempo CBA was void because but for the Union's unlawful strike Contempo would not have signed the new agreement. He then awarded Contempo the difference between the wages and benefits it paid under the Contempo CBA and the wages and benefits it would have paid under the 1995 Woodworker's Association CBA--a sum, as we have said, exceeding $430,000. Voiding the Contempo CBA became a remedy for the Union's breach of the 1995 Woodworkers Association CBA.

We can find no precedent for this approach. As we have mentioned, there are only a few limited doctrines of contract law that make a contract void at its inception./1 The breach of a previous contract between the parties is not one of them. Many things cause people to enter into contracts. Alphonse may yell at Biff in a defamatory way in order to get him to sign a contract. Biff would have an action against Alphonse for defamation. But the contract would be fully enforceable unless the yelling amounted to duress or one of the other contract-voiding doctrines applied. Similarly in our case, the Union breached the 1995 Woodworkers Association CBA in order to get Contempo to sign the Contempo CBA. Contempo is entitled to damages for the breach. But the Contempo CBA is fully enforceable unless there was duress, mistake, misrepresentation, etc. The enforceability of the Contempo CBA must stand or fall on the issue of duress.

No one has suggested that anyone in the Union held a gun to the heads of Contempo's negotiators or twisted their arms, so we are talking here about economic duress. In Illinois,

Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable . . . . To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract."

Resolution Trust Corp. v. Ruggiero, 977 F.2d 309, 313 (7th Cir. 1992) (quoting Alexander v. Standard Oil Co., 423 N.E.2d 578, 532 (Ill. App. Ct. 1981)). There is no question in this case that the Union had Contempo over a barrel. The exhibit/display industry is extremely time-

sensitive, and the Union struck just as Contempo was negotiating a multiyear, multimillion-dollar contract for a new phase in its business-- building mini banks inside Chicago area grocery stores for Bank of America. Considering all the evidence presented at trial, however, the district judge found as a matter of fact that Contempo officials were not "bereft of the quality of mind essential to the making of a contract" when they entered into the Contempo CBA. We see no reason to quarrel with this finding. "Duress is not shown by the fact that one was subjected to . . . a difficult bargaining position or the pressure of financial circumstances." Id. Contempo's officials were between a rock and a hard place, and they made a rational, calculated economic decision not to fight the Union. Instead, they entered into a new collective bargaining agreement that would ensure their ability to pursue the Bank of America contract.

Contempo argues that the fact that it had the ability to make a rational business decision does not mean that it was not under economic duress when it signed the Contempo CBA. The company cites the textbook example of economic duress:

A contracts to excavate a cellar for B at a stated price. A begins the excavation and then threatens not to finish it unless B makes a separate contract to excavate the cellar of another building. B, having no reasonable alternative, is induced by A's threat to make the contract. A's threat is a breach of his duty of good faith and fair dealing, and the proposed contract is voidable by B.

Restatement (Second) of Contracts sec. 176 cmt. e, ex. 9 (1977); see also Austin Instrument Co. v. Loral Corp., 272 N.E.2d 533 (1971) (holding that subcontractor's refusal to deliver goods needed by general contractor to fulfill a government contract unless the general contractor paid more and awarded the subcontractor a second subcontract constituted duress); E. Allan Farnsworth, Contracts, 277 (2d ed. 1990). A's decision to sign the new contract is a rational, calculated business decision, but A has still acted under economic duress. Contempo argues that its officials similarly made a rational decision to sign the Contempo CBA but signed under economic duress. The company is correct about the fact that when it comes to duress, rationality is really not the issue. A decision made under duress is usually perfectly rational. If Alexandra threatens to burn down Bertolt's house unless he signs a contract to buy a box of Girl Scout cookies from her, and Bertolt believes she

will carry out the threat, it is perfectly rational for him to buy the cookies. The reason we define this situation as duress is that Alexandra has improperly achieved an unfair advantage over Bertolt. That is why the Restatement emphasizes A's breach of the duty of good faith and fair dealing when he refuses to complete his unambiguous duty to complete the excavation already begun.

Other commentators also emphasize the importance of good faith and fair dealing in the duress analysis:

extortion of a "modification" without legitimate commercial reason is ineffective as a violation of the duty of good faith. . . . The test of "good faith" between merchants or as against merchants includes "observance of reasonable commercial standards of fair dealing in the trade" (Section 2-103) and may in some situations require an objectively demonstrable reason for seeking a modification.

Uniform Commercial Code 2-209, Comment 2. A critical issue in the duress analysis, then, is whether one party acted in bad faith to gain an unfair disadvantage over another. In the textbook case, A's duty to complete the excavation was clear, and A acted in bad faith in violation of that duty to gain advantage over B.

There is little evidence in the case before us today that the Union acted in similar bad faith when it struck Contempo in March of 1996. The issue of whether the 1995 Woodworkers Association CBA, including its no-strike clause, applied to Contempo and the other hard card employers was hotly contested at the time of the strike. The Union decided to take a chance on how a court would decide the issue and timed its strike to coincide with a moment of extreme vulnerability for Contempo. This is what unions do. The doctrine of economic duress should not operate to discourage hard bargaining between adversaries. Even if the Union knew that the 1995 Woodworkers Association CBA applied to Contempo, it had a "demonstrable reason for seeking a modification" or a new agreement. The Union had negotiated the 1995 Woodworkers Association CBA thinking that it would not apply to exhibit/display employers, and it believed that a contract specifically tailored to the exhibit/display industry had become necessary. In light of the uncertainty of the applicability of the 1995 Woodworkers Association CBA and the Union's belief during its negotiations with the Woodworkers Association that separate agreements with exhibit/display

employers would be necessary, it does not seem that the Union was acting in bad faith when it struck Contempo.

The dissent treats Contempo's signing of the superseding CBA as an effort to mitigate its damages for the union's wrongful breach-- something the Restatement of Contracts requires. However, an equally basic principle of contract law provides that when two parties to a contract sign a subsequent inconsistent contract regarding the same subject matter, the first contract is superseded and the attendant duties are discharged. See Restatement of Contracts sec. 408 (1932). Contempo signed a superseding agreement that discharged the Union's duties under the old agreement. The fact that the Union had Contempo over a barrel does not change that, unless one of the contract-voiding principles applies. As we have discussed, none of those principles applies here.

Because Contempo was not acting under the kind of duress we have been talking about when it signed the Contempo CBA, that agreement superseded and discharged the hard card agreement between the parties. Contempo is still entitled to damages for the Union's breach of the no-strike clause in the then-operative Woodworkers Association CBA. We therefore AFFIRM the district court's award of $11,738.45 ($11,574.48 for the 2-day strike plus $163.97 in prejudgment interest). However, we REVERSE the district court's holding that the Contempo CBA was void and its award of the $433,139.39 difference in wages and benefits between the Contempo CBA and the 1995 Woodworkers Association CBA and the attached prejudgment interest. And so the judgment is modified and, as modified, it is AFFIRMED. Each side shall bear its own costs.

/1  The dissent asserts that we don't have to find the Contempo CBA void in order to award the $430,000 difference in wages and benefits. But awarding the wage and benefits difference has the practical impact of voiding the Contempo CBA-- whether we actually say that's what we're doing or not.

RIPPLE, Circuit Judge, dissenting.  Contempo Design, Inc. ("Contempo") brought this action against the Chicago and Northeast Illinois District Council of Carpenters ("the Union")

under sec. 301 of the National Labor Management Relations Act, 29 U.S.C. sec. 185,/1 for a declaratory judgment and damages. The Union had struck Contempo in March of 1996 despite a "no-strike" clause in the collective bargaining agreement ("the WAC CBA"). Contempo asked the district court to declare the Union bound by the WAC CBA and, further, to assess $451,013.98 in damages against the Union--profits lost during the strike plus the difference between what Contempo would have paid its Union employees under the WAC CBA and what it actually paid them under a new collective bargaining agreement ("the Contempo CBA") signed a day after the strike began. On Contempo's motion for summary judgment, the district court concluded that the WAC CBA operated at the time of the strike and, consequently, that the Union had violated its no-strike provision. At a subsequent bench trial, the district court went on to find that, although Contempo did not sign the Contempo CBA under economic duress, the agreement was nevertheless void ab initio. Contempo ultimately received all the relief it had requested, and the Union appealed. The majority now agrees that the WAC CBA operated at the time of the strike, that the Union breached its no-strike clause, and that the Contempo CBA was not signed under duress. However, it reverses the determination that the Contempo CBA was void ab initio and holds instead that the Contempo CBA replaced and discharged the WAC CBA. On this basis, the court now reduces Contempo's damages to $11,574.48-- profits Contempo lost during the two-day strike. It deprives Contempo of the costs it incurred in operating under the Contempo CBA (rather than the WAC CBA) from the time of the strike forward.

The majority proceeds on the assumption that the award of damages to Contempo can be justified only by declaring the superseding Contempo CBA void and permitting the WAC CBA to function as the governing agreement. I do not believe that it is necessary or appropriate to address the question of the validity of the superseding Contempo CBA. As the district court recognized, Contempo's agreement to that second CBA was a legitimate attempt on its part to mitigate its damages. Faced with a strike and a very significant loss of business, Contempo agreed to a less favorable agreement than the one to which it claimed to be a party. It incurred higher wage costs, for which it now claims recompense, but it stayed in business and suffered lower damages than those it would have incurred had it continued to resist the Union at the price of a prolonged strike.

It is well settled that an employer may seek lost profits from a union that strikes in violation of a no-strike provision in its collective bargaining agreement. See Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, 370 U.S. 254, 266 (1962); John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, 913 F.2d 544, 558 (8th Cir. 1990). Generally, such damages aim to place the aggrieved party in the place it would have been had the breach not occurred. See Chicago Painters & Decorators Funds v. Karr Bros., Inc., 755 F.2d 1285, 1290 (7th Cir. 1985). Damages must be foreseeable, certain, and may not include any losses that the injured party reasonably might have been able to avoid or failed to mitigate. See Restatement (Second) of Contracts sec.sec. 347, 350 to 353 (1981). The Restatement illustrates well the doctrine of mitigation:

A contracts to supervise the production of B's crop for $10,000, but breaks his contract and leaves at the beginning of the season. By appropriate efforts, B could obtain an equally good supervisor for $11,000, but he does not do so and the crop is lost. B's damages for A's breach of contract do not include the loss of his crop, but he can recover $1,000 from A.

Restatements (Second) of Contracts sec. 350 Illus. 6.

Here, Contempo simply heeded the Restatement's basic teaching, and the district court determined that $433,139.39 of Contempo's damages could be viewed as profits lost in mitigating the harmful effects of the illegal Union strike. As the district court noted, Contempo had financial difficulties in March 1996, when the strike against it began. Compounding the financial pressures associated with its indebtedness, the Union's illegal strike threatened to destroy Contempo's opportunity for a multi-year, multimillion, dollar contract building mini-banks inside grocery stores for Bank of America. Faced with the possibility of losing $433,139.39 or the possibility of losing considerably more in lost business, Contempo chose to minimize its damages and to sign a new contract with the Union. In terms of the Restatement's example, lest its "crop" wither, Contempo chose to spend the extra $433,139.39 that the Union demanded to mind the "farm."

Contempo's situation and the Restatement's example differ in that the example involves mitigation through a new contract with a third

party, whereas Contempo's case involves mitigation through a new contract with the old breaching party (the Union). However, in the context of a labor contract, this distinction is hardly relevant. Contempo, the non-breaching party, had little choice but to make arrangements with the Union that represented its workers.

In Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, 623 F.2d 1354 (9th Cir. 1980), a snack-food manufacturer paid bonuses to some of its employees and retained others on the payroll to assure a capacity to operate if the strike should end. The Union disputed its responsibility for these payments. Then-Judge Kennedy, writing for the court, held that the expenditures were "recoverable as justifiable expenses to minimize the damage caused by the strike. Payment of the bonuses was designed to retain experienced management personnel who would be likely to leave if their salaries were decreased because of the strike." Id. at 1364. Retaining the secretarial and clerical staff was reasonable because Frito-Lay was entitled to maintain "a standby posture for resuming full operations as soon as the strike halted, thus to minimize business losses." Id. Contempo found itself in a situation in which the practicalities it faced were similar to those of Frito-Lay. Both companies had to pay increased wage costs to weather illegal union activity that jeopardized its business. Frito-Lay paid extra sums to non-striking employees to keep them from leaving; Contempo Design paid extra sums to striking employees to get them to come back.

It is well-established that damages in a breach of contract action under sec. 301 of the Labor Management Relations Act "should place the aggrieved party in the place [it] would have been in had the breach not occurred." Karr Bros., 755 F.2d at 1290. Here, the district court found that the increased wage costs were attributable to the illegal strike and were a foreseeable consequence of the Union's illegal activity. The majority does not challenge the principle of law; nor does it challenge the district court's factual determination that the damages at issue are attributable to the Union's illegal activity. In the majority's view, although the law required Contempo Design to help itself by mitigating the damages attributable to the Union's breach, it would have been better off to have done nothing but sit out the strike, incur huge losses, and then have sued for their recovery. Contempo attempted to mitigate damages; the majority now penalizes it for recognizing its obligation to do so.

The result the majority reaches today is not consistent with national labor policy as expressed in the National Labor Relations Act; it deprives Contempo Design of its right to be compensated for the harm it suffered from the Union's illegal breach. Accordingly, I respectfully dissent.

/1 29 U.S.C. sec. 185 creates a federal cause of action for breach of a labor agreement. It provides in part:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. sec. 185(a) (1998).