Jaime ANDINO d/b/a Jaime Andino
Trucking, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 79–1133.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1980.

Decided April 25, 1980.

Reinaldo Ramos Collazo, San Juan, P. R., with whom Donald M. Hall and McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P. R., were on brief, for petitioner.

Linda Dreeben, Atty., Washington, D. C., with whom Kenneth B. Hipp, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, WISDOM, Senior Circuit Judge,* CAMPBELL, Circuit Judge.

WISDOM, Circuit Judge.

This case involves a petition for review of an order by the National Labor Relations Board (NLRB) under § 10(f) of the National Labor Relations Act (NLRA), as amended, 61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C. § 151 *et seq.* The order arose from an unfair labor practice charge filed by Jaime Andino d/b/a Jaime Andino Trucking (the Company). It alleged that the Union de Tronquistas de Puerto Rico, Local 901, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (the Union), violated §§ 8(b)(4)(i) and (ii)(A) of the NLRA by forcing the Company to sign a stipulation that it would be bound by a collective bargaining agreement between the Union and the Hermandad de Camioneros del Norte (Hermandad). An administrative law judge agreed with the Company. The NLRB disagreed. The Board held that the Company was a member of the Hermandad, and that the Union's act was therefore unexceptionable. 240 N.L.R.B. No. 141. We affirm the NLRB's result, and deny the Company's petition for review.

The Company is incorporated in Puerto Rico, and has its office and principal place of business in Bayamon, Puerto Rico. It provides freight transportation services. Jaime Andino is its sole proprietor. The company "operates approximately five trucks and employs several drivers". In December 1969, the Company joined the Hermandad, a multiemployer association made up of approximately 125 trucking companies and self-employed truckers operating in northeastern Puerto Rico. Upon joining, the Company signed an agreement authorizing the Hermandad to represent it in collective bargaining negotiations with the Union.[1] The Company paid the Hermandad monthly dues until 1971; between 1969 and 1974 Andino, for the Company, attended between thirty and forty Hermandad meetings. When invited to attend meetings after 1974, Andino agreed to do so but apparently did not attend.

In 1972, the Hermandad, simultaneously with three other, similar, multiemployer as-

---

* Of the Fifth Circuit, sitting by designation.

1. The authorization form authorized the Hermandad

   To represent me, to discuss and sign collective bargaining agreements binding on the membership with the Labor Union that [the Company] recognizes or is legally certified.

sociations,[2] negotiated and signed collective bargaining agreements with the Union. The agreements were effective from July 1, 1972, through December 31, 1974. There is no doubt that the Company was bound by the 1972–74 agreement.

As these agreements were about to expire, in late 1974, the Hermandad and the three other multiemployer associations formed yet another group—the Federacion de Camioneros de Puerto Rico (Federacion) —to negotiate a collective bargaining agreement with the Union on behalf of all the members of each association. The Federacion held a number of bargaining sessions with the Union from late 1974 through March 24, 1975. They were inconclusive. On March 24 the Hermandad's membership voted to appoint a committee to negotiate a separate agreement between the Hermandad and the Union. That committee worked out an agreement with the Union within a week; it was executed on April 1, 1975. The agreement covered the period January 1, 1975 through December 31, 1975, with an automatic renewal provision.[3] An appendix to the agreement contained a list of Hermandad members, including the Company.

The agreement was renewed through December 31, 1977. On December 16, 1977, the Union and the Hermandad entered into a written stipulation extending the agreement, with amendments, from December 31, 1977, through November 1, 1978.

On December 27, 1977, a Union representative, Carlos Rodriguez, and two others stopped Esteban Andino, a Company employee, as he was removing a Company truck from a Union terminal. They told

him he could not remove the truck unless Jaime Andino, his brother, came to the terminal. When Andino arrived, he was initially told that he could not remove his truck unless he signed the stipulation entered into by the Hermandad and the Union. Andino asked for a copy, so that he could study it and consult his attorney. The Union men gave him a copy of the stipulation and told him to bring it back, signed, by noon that day, adding that he could remove the truck Esteban was driving, but no others, until he had signed. Andino met Rodriguez the next morning, and Rodriguez repeated his terms. Andino in response filed the unfair labor practice complaint at issue.

## I.

The key question is whether the Company was a member of the Hermandad when it met with the Union in March 1975 and reached the agreement in effect through 1978. The section of the NLRA the Union allegedly violated by trying to force Andino to sign the stipulation forbids a Union to force an employer "to join any employer organization".[4] The Company argues that it was no longer a member of the Hermandad when the Union tried to force it to sign the stipulation. The Union, under this view, was forcing it to join the Hermandad.

The Company makes three arguments that its membership in the Hermandad terminated. (1) The Company had ceased to be a member by refusing to pay dues and by not attending meetings; the Union, knowing this, consented. (2) The creation of the Federacion extinguished the Her-

---

**2.** The other organizations were the Association de Camioneros del Sur, the Association de Camioneros del Oste, and the Puerto Rico Trucking Association, Inc.

**3.** On the same date two of the other multiemployer associations also executed collective bargaining agreements with the Union effective from January 1, 1975 to December 31, 1977.

**4.** Section 8(b)(4) provides that it is an unfair labor practice for a Union

. . . (i) to engage in, or to induce or encourage any individual employed by any

person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(a) forcing or requiring any employer . . . to join any . . . employer organization.

mandad. The "Hermandad" that negotiated the 1975 agreement with the Union and later signed the stipulation was an altogether different entity, of which the Company was not a member. (3) "Unusual circumstances" justified the Company's "withdrawal" from the Hermandad. We conclude that none of the Company's arguments has merit.

## A.

The Company first argues that its membership in the Hermandad ended when: (a) it ceased to participate actively in the Hermandad, (b) the Union "consented" to its non-participation.

■ As a general proposition, once an employer such as the Company joins a multimember collective bargaining association such as the Hermandad, the employer may withdraw from the multimember association and so avoid being bound by any agreement it reaches with the Union, only if the employer gives written notice to the Union *before* collective bargaining begins. *Carvel Co. v. NLRB*, 560 F.2d 1030, 1034 (1st Cir. 1977). *See NLRB v. Acme Wire Works*, 582 F.2d 153, 157 (2d Cir. 1978); *NLRB v. Central Plumbing Co.*, 492 F.2d 1252, 1255 (6th Cir. 1974).[5]

■ No notice was given in this case. There was, therefore, no withdrawal. It will not do, as the Company suggests, to rely on the implied consent of the Union. The Union apparently took no action against the Company to enforce the agreement the Union had with the Hermandad, but the Union was not under any obligation to take such action. The Union had a right to rely on the Company's continued participation in the Hermandad until the Company gave notice of withdrawal. This it never did.

## B.

The Company argues, second, that the creation of the Federacion extinguished the Hermandad. When the Federacion broke up in March 1975, and the Hermandad negotiated an agreement with the Union, it was a new entity to which the Company did not belong.

The facts point away from the Company's conclusion. The Federacion was established by a group of representatives from each of the participating employer associations. Pablo Llanos, president of the Hermandad, and Victor Urbino, who became president of the Federacion, represented the Hermandad. An attorney, Daniel Dominguez, was hired by the Federacion to assist in the negotiations.

Each of the four employer associations distributed forms to their employer members, which authorized the Federacion to bargain in their behalf. Only 67 members of all four associations signed the forms; of 125 members of the Hermandad, 33 signed the form. The Federacion's attorney, Dominguez, then sent the Union this list of the employers with the caveat that it might be incomplete.

The Union's Secretary-Treasurer, Luis Pagan, notified Llanos on October 23, 1974, that the Hermandad-Union agreement would expire on December 31, and that the Union was ready to begin negotiations. According to the administrative law judge,

> The Hermandad did not respond to this letter. Instead the Federacion, by a letter to Secretary-Treasurer Pagan, from Victor Urbino, advised Pagan that he had been named president of the bargaining committee . . . and requested arrangements for the first negotiating meeting.

> [The Union's] organizing representative Jose Cadiz . . . and Attorney Primitivo Pagan, who also represented the [Union] informed Attorney Dominguez they would not accept an amendment of the negotiating norms and had always had collective-bargaining agreements with the various hermandads and said they would not get anywhere with the Federacion.

---

**5.** "Unusual circumstances", which may also justify a withdrawal, are discussed in Section C below.

This prediction was borne out in the negotiations. The Union and the Federacion committee held several bargaining sessions between late 1974 and March 24, 1975. They reached no agreement.

On March 24, 1975, the Hermandad's membership approved a new bargaining committee to represent it in negotiating with the Union. On April 1, the Hermandad and the Union signed a new agreement. Similar agreements were independently negotiated by each of the other multiemployer associations.

█ On this record, it appears that the Hermandad was not extinguished by the creation of the Federacion. A more natural reading of the facts would be that the Federacion was a committee of convenience by which the four associations tried to coordinate their bargaining efforts, and that it was a failed experiment. The authorization forms [6] distributed by the Hermandad and the other associations are not to the contrary. It appears that the few employers who signed them were not creating a new association by so doing, but were acknowledging that the Federacion had the power to bargain for them. The Company, then, was a member of the Hermandad when it signed the collective bargaining agreement with the Union in April 1975.

## C.

█ Nor were there any "unusual circumstances" that would have permitted the Company to withdraw from the Hermandad once negotiations began with the Union. Such circumstances include an impasse, *Carvel Co. v. NLRB*, 560 F.2d 1030, 1035 (1st Cir. 1977); *Fairmont Foods Co. v. NLRB*, 471 F.2d 1170, 1172–73 (8th Cir. 1972), and dissolution of the multiemployer association, *NLRB v. Southwestern Colora-* do Contractors Assoc., 379 F.2d 360, 364 (10th Cir. 1967). The Company incorrectly argues that one or both of these "unusual circumstances" were present. Here there was no impasse between the Hermandad and the Union: They signed an agreement within a week after negotiations began. And there was no dissolution of the Hermandad, as we pointed out in subsection B of this opinion.

## II.

█ A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ". *Universal Camera Corp. v. NLRB*, 340 U.S. 478, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The standard is not modified when the Board and its administrative law judge disagree. *Id.* at 496, 71 S.Ct. at 468. *See NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir. 1978).

█ The decision of the Board—that the Company was a member of the Hermandad and that the Union therefore did not violate the NLRA by trying to get it to sign the stipulation—does not flout the evidence; it is not irrational; we therefore affirm it. The petition for review is DENIED.

**6.** The form provided:

I, _____, of legal age, _____ and a resident of _____, authorize Federacion de Camioneros de Puerto Rico and its spokesman, the President, MR. VICTOR M. URBINO, to bargain on behalf and in representation of _____ the contract that will govern the labor-management relations between the Company _____ and Union de Tronquistas de Puerto Rico, Local 901.