Eliot LABBÉ, et al.

v.

W. M. HEROMAN & CO., et al.

Civ. A. No. 79–28–A.

United States District Court,
M. D. Louisiana.

Sept. 14, 1981.

George K. Anding, Baton Rouge, La., for plaintiffs.

Joseph E. Juban, Baton Rouge, La., for defendants.

JOHN V. PARKER, Chief Judge.

Plaintiffs, Eliot Labbé and Johnny L. Hodges, in their capacities as chairman and co-chairman of the Welfare, Pension and Educational Training Funds of Carpenter's Local 1098, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, bring this action against defendant, W. M. Heroman & Co., Inc. Plaintiffs claim that defendant was a party to a series of labor contracts with Local 1098 which required the defendant to make contributions to the Funds on behalf of each member of Local 1098 employed by defendant. The trustees demand an audit to determine the amount owed, judgment in that amount, costs of the audit, attorneys fees and an order to defendant directing it to comply with the terms of the agreements. Defendant denies that it has had any contractual relationship with Local 1098 since the then existing contract expired on March 31, 1973, it avers that it has paid all amounts owed to the Funds for the period of that contract and denies any liability.

This action was brought under the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a), and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e) and (f), and the Court has jurisdiction by virtue of those statutes.

The action was tried to the Court, sitting without a jury, and has been submitted on briefs. This opinion will constitute the findings of fact and conclusions of law required by Rule 52(a) Fed.R.Civ.P.

I.

The Baton Rouge Chapter of the Associated General Contractors of America is an association of contractors in the area of Baton Rouge, Louisiana. For a number of years the AGC has bargained with certain craft unions, including Local 1098, on behalf of its members and other employers as a multi-employer bargaining unit. The practice of the AGC had been to negotiate labor contracts on behalf of all of its members but in 1972 it changed that procedure. The AGC contract with Local 1098 then in effect expired March 31, 1973 and, prior to beginning negotiations, the AGC requested individual authorization from each of its members or other employers that it was to bargain for. On December 14, 1972, the defendant, in writing, notified the AGC that it elected not to be represented by it in labor negotiations with Local 1098 and several other unions. Prior to negotiations on each of the contracts with Local 1098, the AGC negotiating committee furnished the union negotiating committee a list of the employers that the AGC was representing in those negotiations. Each contract negotiated between the AGC and Local 1098 contained an appendix listing those employers who were "signatory hereto". The defendant, Heroman, was listed in the appendix to the contract effective from April 1, 1972, through March 31, 1973, but was not included in the 1973–74 list nor in any subsequent list attached to any AGC–Local 1098 contract.

The contracts negotiated between AGC and Local 1098, so far as here pertinent, were: Contract effective April 1, 1972, through March 31, 1973; (as noted above, there is no dispute that the defendant was a party to this contract) Contract effective April 1, 1973, through April 30, 1974; contract effective May 1, 1974 through April 30, 1976; and contract effective May 1, 1976 through April 30, 1978. Apparently, additional contracts have been negotiated between AGC and Local 1098 subsequent to 1978; however, copies of such contracts were not filed in the record, although the parties do not appear to dispute the fact that a contract between AGC and Local 1098 is still in effect.

In 1974, the president of the defendant company, Mr. Heroman, was serving as chairman of the negotiating committee of AGC but, because the defendant declined to submit an authorization in the form requested by AGC, he was removed from that committee. Representatives of 1098 were informed of the removal but were not informed of the cause for the removal. In early 1975, the defendant company terminated its relations with AGC, resigning its membership in the organization.

AGC was not authorized to represent the defendant in labor negotiations after March 31, 1973. Each of the contracts negotiated between AGC and Local 1098 contained a requirement that the employer make a contribution to each of the Funds on behalf of each Local 1098 employee employed. The amounts per hour increased from contract to contract.

The AGC–Local 1098 agreement covering the period of April 1, 1972 through March 31, 1973, contained a duration clause as follows:

"This agreement shall become effective on April 1, 1972. It shall remain in full force and effect through March 31, 1973, the anniversary date hereof and from year to year thereafter unless either party, at least ninety (90) days prior to any anniversary date, notify the other party of its desire to modify or terminate same."

A similar provision was contained in each of the agreements negotiated between the union and the employer unit, however, the agreement effective May 1, 1974, and each subsequent agreement contained a requirement in the duration clause that there be "written notice."

Each of the contracts provided for a reporting form to be used by the employer in paying contributions to the Funds, the form to be prescribed by the trustees. The form contains a certification that it is a true and complete report of the hours worked, contains an acknowledgement that the contributions are made in conformity with written collective bargaining agreements between the AGC and Local 1098 "and to which the employer is also a party" and a provision that the employer "agrees to be bound in all respects by the provisions of the Trust Agreements creating the Health & Welfare Fund, The Pension Fund, and The Education and Training Program Fund." During the period of the 1972–73 contract, the defendant filed these reports and signed the certification. Thereafter, until September of 1976, the defendant continued to file these reports and to sign the certification without qualification. Beginning in September, 1976, the defendant crossed out the certification portion of the contribution form but continued to file the form and pay the contributions.

Mr. McCann, the vice president of the defendant, testified that although he did not consider his company had any obligation to do so or any contractual relationship with Local 1098 after the expiration of the contract on March 31, 1973, he continued to pay the fringe benefits and file the forms because he wanted "labor peace" and he was confident that if he did not do so his employees would complain, he would have difficulty getting carpenters to work for him and that the Local 1098 business agent would "put the pressure" on his company.

Each of the contracts between AGC and Local 1098 contained the provision adopting the provisions of the fund trust agreements by reference. Apparently, the trust agreements contained provisions authorizing the

trustees to audit the books of the employer under certain circumstances, and requiring the employer to pay the cost of the audit and providing for attorneys fees. No evidence of the provisions of the trust agreements has been presented to the Court.

At some point in time which was not established with any degree of clarity, Mr. Louis Juneau, Manager of the Funds, noticed that beginning in September, 1976, the defendant had started crossing out the certification on the reporting forms. He brought this to the attention of the trustees who authorized him to request an audit from the defendant. He contacted Mr. McCann on an informal basis, explained his purpose and requested that the books be made available to representatives of the trustees. Mr. McCann at that time informed him that he was no longer a member of the AGC and that he had no contractual relationships with Local 1098.

Subsequently, again the time was not specified, this information was communicated to the Local 1098 business agent, Johnny L. Hodges, who contacted Mr. McCann on a number of different occasions. During their several discussions, Mr. McCann consistently took the position that he had no contract with 1098 and that he was not obligated to permit an audit or even to pay the fringe benefits. Mr. Hodges took an opposite position and they argued the case to each other repeatedly. As best the Court can determine, the first conversation between Mr. Hodges and Mr. McCann at which the business agent was informed that the defendant had no contract and would not comply with the provisions of the AGC contract, was in late 1976 or early 1977.

On July 16, 1978, the defendant, W. H. Heroman & Co., Inc., entered a labor agreement with Local 1098 which became effective May 1, 1978, and remained in force through April 30, 1980. A written notice attached to that agreement terminates the contract effective April 30, 1980. That contract is modeled upon the form contract in effect between the AGC and Local 1098 but there are some significant changes. First, all provisions relative to the AGC are delet-ed and all provisions relative to adopting the trust agreements by reference are deleted. The employer does however, agree to pay the fringe payments on the form prescribed by the trustees and the evidence establishes that the defendant did pay the fringe benefits during the course of this contract, although it continued to cross out the certification at the bottom of the form. The defendant never at anytime between the opening of contract negotiations for the 1973–74 contract until the present has directed any specific written communication to Local 1098 informing it that it intends to withdraw or has withdrawn from any AGC negotiated contract.

## II.

Plaintiffs claim that once an employer becomes a member of a multi-employer bargaining unit, he cannot withdraw except upon adequate and timely written notice to the union. The plaintiffs reason that, because defendant has never given the union written notice of its withdrawal, the defendant has remained a member of the bargaining unit and is bound by all provisions of the AGC contracts with Local 1098. Alternatively, plaintiffs argue that the actions of the defendant in filing the monthly reports, paying the fringe benefits and signing the certifications amounts to ratification of the subsequent contracts or estop defendant from denying liability for underreported contributions. Defendant argues that there is no requirement of written notification of withdrawal but that written notice was given, consisting of its December, 1972 letter to the AGC declining to authorize representation in negotiations with Local 1098 and the fact that defendant was listed in the "signatory" appendix to the 1972–73 contract but was not included in the list of employers furnished by the AGC to the union prior to the start of the 1973 negotiations or subsequent negotiations. Defendant argues that this constitutes positive written notice that it had withdrawn from the bargaining unit. In the alternative, the defendant claims that this action amounts to a suit for wages past

due and that it is prescribed under Article 3534 of the La. Civil Code, except for wages owed during the one year period prior to filing suit.

We start with the proposition that the National Labor Relations Act does not require that a labor contract be in writing, *N.L.R.B. v. Haberman Const. Co.,* 618 F.2d 288 (5th Cir. 1980); *Daniel Const. Co. v. Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 991,* 364 F.Supp. 731 (D.C.Ala.1973) and that refusal to sign, once an agreement has been reached, constitutes an unfair labor practice. *N.L.R.B. v. Beckham, Inc.,* 564 F.2d 190 (5th Cir. 1977); *N.L.R.B. v. Jeffries Banknote Co.,* 281 F.2d 893 (9th Cir. 1960). Thus, under applicable law, it was not necessary that Heroman sign the AGC contracts in order to be bound by them; any action indicating an intention to be bound is sufficient. *N.L.R.B. v. Haberman Const. Co.,* supra. Defendant does not dispute that it was bound by the 1972–73 AGC agreement with Local 1098 because of his authorization to AGC as a member of the multi-employer bargaining unit.

The N.L.R.B. has long followed the policy that, once an employer becomes a member of a multi-employer bargaining unit, he continues to be bound by the labor contracts negotiated by that bargaining unit until he gives the union notice of his withdrawal at an appropriate time. *N.L.R.B. v. Sklar,* 316 F.2d 145 (6th Cir. 1963); *Ted Hicks and Assoc., Inc. v. N.L.R.B.,* 572 F.2d 1024 (5th Cir. 1978). The Board consistently holds that withdrawal is not timely once contract negotiations have begun and the courts have approved this view. *N.L.R.B. v. Sklar,* supra; *Ted Hicks and Assoc., Inc. v. N.L.R.B.,* supra; *Universal Insulation Corp. v. N.L.R.B.,* 361 F.2d 406 (6th Cir. 1966); *N.L.R.B. v. Sheridan Creations, Inc.,* 357 F.2d 245 (2nd Cir. 1966); *N.L.R.B. v. Jeffries Banknote Co.,* supra. Accordingly, the jurisprudence is established that an employer who has become a member of a multi-employer bargaining unit may withdraw from that unit only by giving timely, adequate and unequivocal no-

tice to that union that he desires to terminate that contractual relationship and that he no longer will be bound by any contract negotiated by the unit. *Detroit Newspaper Publishers Association v. N.L.R.B.,* 372 F.2d 569 (6th Cir. 1967); *Universal Insulation Corp. v. N.L.R.B.,* supra; *N.L.R.B. v. Sheridan Creations, Inc.,* supra; *N.L.R.B. v. Jeffries Banknote Co.,* supra; *Bugher v. Southland Fabricators and Erectors, Inc.,* 452 F.Supp. 870 (D.C.La.1978).

While some circumstances might demand written notice of withdrawal by an employer in order to make it unequivocal, there is no absolute or general requirement for a writing in the absence of contractual provisions to that effect. The only authority cited by plaintiffs in support of their argument is the case of *Paul v. Lindgren,* 375 F.Supp. 843 (D.C.Ill.1974) where the Court did indeed comment that "adequate *written* notice" is required. The facts recited in the reported opinion, however, make it plain that *no* notice of any description was actually given to the union in that case. Thus the statement constitutes *dicta* at best and the authorities cited above are to the contrary. Accordingly, the *dicta* of that case will not be accepted here.

In this case, the defendant, Heroman, was a member of the AGC bargaining unit and was indisputably bound by the 1972–73 contract negotiated by AGC. Thus, Heroman continued to be bound by AGC negotiated contracts until timely, adequate and unequivocal notice of termination was given to Local 1098. Certainly, Heroman had the right to terminate; the issue is when, if ever, was the union notified of that termination.

Heroman's letter in December, 1972, advising AGC that it no longer represented the company, was an internal matter between AGC and Heroman and clearly did not constitute notice to the union of anything. Nor did Heroman's subsequent termination of its membership in the AGC constitute notice to the union of withdrawal from the labor contract. The bargaining unit was not restricted to AGC members

because AGC negotiated for contractors who were not members, as well as for its own members. Moreover, notice to the trustees of the Funds or to Mr. Juneau, the Funds manager, could not and did not constitute notice to the union of anything.

Defendant's position is that deletion of its name from the 1973 list of employers furnished to the union negotiating committee by the AGC negotiating committee constituted timely, adequate and unequivocal notice to the union that it was withdrawing from the bargaining unit and would no longer be bound by AGC negotiated contracts. Defendant argues that the union, by simple comparison of the appendix to the 1972–73 contract, which listed Heroman, with the 1973 negotiating list, disclosed to the union that Heroman was no longer listed and would not be bound by the new contract. In support of that position, defendant relies upon the case of *Westminister Graphics v. N. Y. Typographical Union*, 488 F.Supp. 541 (D.C.N.Y.1980).

The case relied upon by defendant also involved two employer lists but they were submitted to the union in entirely different factual circumstances. There, the employer authorized the multi-employer bargaining unit to represent it in negotiations; the bargaining sessions produced a contract which was agreed to by both committees but rejected by the employer group, although accepted by the union members. The union announced that it would accept no changes and proceeded to sign up individual members of the employer bargaining unit who were willing to accept the terms of the contract. A few days later, substantial numbers of the employers group authorized the bargaining unit to sign the contract on their behalf. It was made plain to the union that some but not all of the employers on the original list accepted the contract. The following day, a complete list of those who accepted the contract was given to the union and thereafter, the union executed the contract. The District Court there held that since the union had the opportunity to refuse to sign the contract after having been furnished the list, it was

well aware that the employer in question had not accepted the contract.

The factual circumstances here, are entirely different from those considered significant by the district judge in the Westminister case. We do not undertake critical analysis of the reasoning of that case or of defendant's proposition that the union should have been able to deduce from the difference in the lists furnished to Local 1098 that Heroman was unequivocally withdrawing. Here, the employer's own actions were not consistent with unequivocal withdrawal.

Heroman continued to certify and file the same reporting forms for fringe contributions as it had filed under the preceding contract. That form and certification declared that Heroman was bound by the AGC contracts and that it was subject to the trust agreements all of which it had previously certified on a monthly basis during the period of the 1972–73 contract. The defendant continued to pay the fringe benefits (although the trustees claim that it did not pay all that it should have) and it paid fringe benefits in accordance with the increasing amounts specified in successive contracts. It also paid union scale as it increased in successive contracts. These acts indicate an intention to be bound by AGC-Local 1098 contracts and in absence of clear, unequivocal notice to the contrary, the union was entitled to consider that Heroman considered itself so bound. *N.L.R.B. v. Haberman Const. Co.*, supra; *Bugher v. Southland Fabricators and Erectors, Inc.*, supra.

Thus, the Court concludes that Heroman is bound by the AGC-Local 1098 contract effective April 1, 1973, through April 30, 1974, the contract effective May 1, 1974 through April 30, 1976 and the contract effective May 1, 1976 through April 30, 1978 until it gave the union timely, adequate and unequivocal notice of withdrawal.

The Court concludes that the several conversations between Mr. Hodges, business agent for Local 1098, and Mr. McCann, vice president of the defendant, beginning in late 1976 or early 1977, did make it plain to

the union that Heroman no longer considered itself bound to any AGC labor contracts and that Heroman had no contract with Local 1098. Although the contract applicable at that time required written notice and these were oral conversations, the Court accepts then as adequate notice because Heroman's position was made absolutely clear to the union and written notice would have been redundant.

That conclusion does not, however, resolve the issue. In late 1976 or early 1977, at the time of these discussions, the contract was already in full force and effect and it did not expire until April 30, 1978. An employer cannot withdraw during the term of the contract, without the consent of the union and therefore Heroman remained bound until the expiration of that agreement. As noted earlier, Local 1098 and Heroman negotiated their own contract effective May 1, 1978, and that contract expired on April 30, 1980. Since that date, there have been no contractual relationships between Local 1098 and Heroman.[1] Heroman's actions here, beginning with its December, 1972, letter terminating AGC representation and continuing through its regular payment of contributions to the funds and certification accepting AGC contracts, indicate a desire to slip away from the union contract in a fashion that would attract as little attention as possible. Mr. McCann, the defendant's vice president, wanted "labor peace" and he was well aware that if he unequivocally informed Local 1098 that his company was terminating the union contract, Mr. Hodges, the business agent, would "put the pressure on". The defendant hoped to avoid that pressure by paying union scale and making contributions to the funds and it never made its intention to withdraw unequivocally to the union. For that reason, it is bound to the contracts specified above and plaintiffs are entitled to an accounting.

The trust agreements to which defendant bound itself, at least until it crossed out the certifications on the reporting forms, apparently provide for audits, audit fees and attorneys fees. Since no evidence was offered to the Court of those contract provisions, the Court cannot enforce those provisions. The plaintiffs are clearly entitled to an accounting from the defendant because they do have evidence that there may have been under reporting of contributions to which they are entitled under the AGC contracts and defendant is ordered to make such an accounting. Plaintiffs are, of course, entitled to verification by examination of the defendants' business records.

The Court holds that this action is not one for wages and is therefore not subject to the one year prescription of Article 3534. Plaintiffs here are simply suing for a breach of contract in their capacity as third party beneficiaries of those contracts and they are entitled to an accounting for all periods beginning with the 1972–73 contract and concluding with the termination of contractual relations on April 30, 1980.

Counsel for plaintiffs is directed to prepare a judgment in accordance with these findings and to submit it for signature.

---

1. Defendant argues that since it refused to check off union dues after the expiration of the 1972–73 contract, Local 1098 should have been aware that it was not complying with and was not subject to the AGC contract. Each of the contracts had a check off provision but each required specific authorization by each employee and there are too many other explanations for failure to check off union dues, particularly for a small employer such as Heroman. The reports filed on contributions usually list anywhere from one to three or four carpenters, although on rare occasions Heroman might list as many as fourteen or fifteen for a brief period of time. The Court concludes that failure to remit union dues does not equate to timely, adequate and unequivocal notice of withdrawal from a union contract.