**LOCAL 145, INTERNATIONAL LADIES GARMENT WORKERS' UNION, AFL–CIO, Plaintiff,**

v.

**FASHION ASSOCIATES, INC., Defendant.**

**INTERNATIONAL LADIES GARMENT WORKERS' UNION, LOCAL 145, Marshall L. Rosenberg, and Sportswear Apparel Association, Inc., Plaintiffs,**

v.

**FASHION ASSOCIATES, INC., A.F.G., Inc., American Fashion Group, Inc., The European Tailoring Group, Ltd., Inc., J.S. Corp., and Jennifer Corp., t/a Fashion Associates, Defendants.**

Civ. A. Nos. 83–3738, 84–1449.

United States District Court, D. New Jersey.

Aug. 3, 1984.

Reitman, Parsonnet, Maisel & Duggan by Bennet D. Zurofsky, Newark, N.J., for plaintiffs.

Hellring, Lindeman, Goldstein, Siegal & Greenberg by Richard Coplon, Newark, N.J., for defendants.

SAROKIN, District Judge.

These related matters are before the court on various motions of the parties. These include the motion of Local 145, I.L. G.W.U. ("the Union") for summary judgment, and Fashion Associates' motions to enjoin ongoing arbitration between the parties, to vacate the default judgment in Civil Action No. 83–3738, entered November 28, 1983, to disqualify Union counsel and for reconsideration of the court's order of June 13, 1984 holding Fashion Associates and its

President, Jerome Finkelstein, in contempt. Underlying most of these motions, and at the root of this litigation since its inception is but one issue: whether a valid collective bargaining agreement exists between the parties. The Union argues the existence of such an agreement based upon Fashion Associates' failure properly to withdraw from the multi-employer bargaining unit of which it had been a member since 1974, namely the Sportswear Apparel Association ("SAA"). Fashion Associates claims that disputed issues of fact surround such withdrawal and that, in particular, the Union's actions reveal an understanding that no agreement existed between the parties. It contends, *inter alia,* that until the court determines whether a contract exists, the arbitrator's jurisdiction to resolve the current dispute between the parties is in doubt, and thus, that all arbitration should be stayed pending the court's determination.

## FACTS

In support of its motion for summary judgment on the issue of the existence of a contract, the Union submits two pieces of evidence.[1] The affidavit of Sol Goldberg, Vice President of the I.L.G.W.U. and Director of the New Jersey Region of the I.L.G.W.U. states

> I have caused a review to be made of all files known to the International Ladies' Garment Workers' Union, New Jersey Region, regarding Fashion Associates in order to determine whether the Union ever received a letter from Fashion Associates, Inc., wherein it unequivocally and in writing withdrew from the Sportswear Apparel Association, Inc. at any time prior to the negotiation and settlement of the contract covering the period June 1, 1982, through May 31, 1985, between the I.L.G.W.U. and the Sportswear Apparel Association, Inc.
>
> There is no such letter in any of our files.

I have also made inquiry of all known representatives of the Union who have had dealings with Fashion Associates, Inc., as to whether they recall ever receiving or seeing such a letter. None has any such recollection.

Goldberg Aff. ¶¶ 3–5. Also submitted, appended to counsel's affidavit was the sworn testimony of Sidney Reiff, Executive Director of the SAA, stating that on December 22, 1983, he informed Jerome Finkelstein that Fashion Associates were "still members of the Association."

> He was going to show that they were not members of the Association. I said show what you want, but we have no letter of resignation. We have never so notified the Union, so you're still a member of the Association.

Testimony of Sidney Reiff (5/9/84) at 36. *See also Id.* at 37.

Fashion Associates concedes that it gave no written notification of its "resignation" from the SAA. Aff. of Jerome Finkelstein (7/11/84) ¶ 29. Rather, it contends that, first, the Union abrogated its eight-year-old agreement with Fashion Associates by attempting to "organize all workers at the factory," and thereby, "to eliminate double-breasting," *id.* ¶¶ 12–13, defined as "the practice of simultaneous Union and non-Union operations." *Id.* ¶ 8. M.. Finkelstein states

> In response to their demands, I immediately informed the Union that competitive pressures precluded any possibility that all manufacturing operations at the factory could be unionized but did offer to negotiate a change in our long-standing relationship. The Union's subsequent conduct confirms that the Union also recognized that the prior agreement was nullified.

*Id.* ¶ 14.

After March, 1982, when the Union began to assert this position, Fashion Associates "immediately informed Mr. Reiff that

---

**1.** Elsewhere, the Union has argued that Fashion Associates admitted the existence of the contract in question. *See* Union's Letter Brief (6/11/84), Exh. 4, ¶ 5 (Affidavit of Matthew M. Keshishian, attorney for Fashion Associates, dated 7/5/83), Exh. 5, ¶ 4 (Affidavit of Jerome Finkelstein, dated 10/18/83).

we would no longer belong to his Association and that he could not bind our factory to any agreement between the Association and the Union." Thereafter, Fashion Associates ceased paying dues to the SAA. *Id.* ¶ 16. Fashion Associates does not claim that such resignation was communicated directly to the Union, but states that "[t]he Union, of course, knew that Fashion Associates, Inc. was not represented or bound by any agreement between the Association and any I.L.G.W.U. local." *Id.* ¶ 18. Though stating that "the Union has repeatedly confirmed its understanding that no collective bargaining agreement was in effect," *ibid.*, Fashion Associates points to only two facts in support thereof. First, it states that the Union continued to press for an end to double-breasting, through arbitration, *id.* ¶¶ 19–22, and organization. *Id.* ¶ 20. Second, it notes that, in 1983, the Union failed "to remit vacation pay directly to its members," as it had done in the past, under the prior contractual relationship. *Id.* ¶ 23. In sum, Fashion Associates contends that the facts averred give rise to some question as to whether the parties' agreement had been terminated, and, if so, as to the Union's knowledge of such termination.

## DISCUSSION

The Union's position is that, in that it is conceded that it was given no formal notice—written or oral—of Fashion Associates' withdrawal from the SAA, no such withdrawal occurred, irrespective of the myriad factual averments of Fashion Associates. In so contending, the Union relies on the National Labor Relations Board ("NLRB") rule first set forth in *Retail Associates, Inc.*, 120 NLRB 388 (1958). There, the Board noted the importance of controlling union or employer withdrawal from collective bargaining on a multiemployer basis.

> The right of withdrawal by either a union or employer from a multiemployer unit has never been held, for Board purposes, to be free and uninhibited, or exercisable at will or whim. For the Board to tolerate such inconstancy and uncertainty in the scope of collective-bargaining units

would be to neglect its function in delineating appropriate units under Section 9, and to ignore the fundamental purpose of the Act of fostering and maintaining stability in bargaining relationships. Necessarily under the Act, multiemployer bargaining units can be accorded the sanction of the Board only insofar as they rest in principle on a relatively stable foundation. While mutual consent of the union and employers involved is a basic ingredient supporting the appropriateness of a multiemployer bargaining unit, the stability requirement of the Act dictates that reasonable controls limit the parties as to the time and manner that withdrawal will be permitted from an established multiemployer bargaining unit. Thus, the Board has repeatedly held over the years that the intention by a party to withdraw must be unequivocal, and exercised at an appropriate time. The decision to withdraw must contemplate a sincere abandonment, with relative permanency, of the multiemployer unit and the embracement of a different course of bargaining on an individual-employer basis. The element of good faith is a necessary requirement in any such decision to withdraw, because of the unstabilizing and disrupting effect on multiemployer collective bargaining which would result if such withdrawal were permitted to be lightly made. The attempted withdrawal cannot be accepted as unequivocal and in good faith where ... it is obviously employed only as a measure of momentary expedience, or strategy in bargaining ....

120 NLRB at 393–94. The Board thus arrived at the following rule, which has remained unchanged since the *Retail Associates, Inc.* decision:

> An employer or union may withdraw from multiemployer bargaining for any reason provided that it gives adequate written notice prior to the date set for renegotiation of the existing contract or the date on which negotiations actually commence. Once negotiations start, a party can withdraw only with the "mutu-

al consent" of the parties or where "unusual circumstances" exist.

*General Printing Co.*, 263 NLRB 591, 592 (1982), citing *Retail Associates, Inc., supra,* 120 NLRB at 395. This rule has been consistently followed by the Supreme Court and the Courts of Appeals. *See, e.g., Charles D. Bonanno Linen Service v. NLRB,* 454 U.S. 404, 405, 411 and n. 5, 102 S.Ct. 720, 721, 724 and n. 5, 70 L.Ed.2d 656 (1982); *N.L.R.B. v. Hayden Electric, Inc.,* 693 F.2d 1358, 1363–64 and n. 7 (11th Cir. 1982); *N.L.R.B. v. Custom Sheet Metal & Service Co., Inc.,* 666 F.2d 454, 457–58 and n. 11 (10th Cir.1981); *N.L.R.B. v. Callier,* 630 F.2d 595, 597 (8th Cir.1980); *Andino v. N.L.R.B.,* 619 F.2d 147, 150 (1st Cir.1980); *Authorized Air Conditioning Co. v. N.L. R.B.,* 606 F.2d 899, 906 (9th Cir.1979); *N.L. R.B. v. Independent Association of Steel Fabricators, Inc.,* 582 F.2d 135, 145–49 (2d Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979); *N.L.R.B. v. Beck Engraving Co., Inc.,* 522 F.2d 475, 480–81 (3d Cir.1975). Certain factual patterns have given rise to conflicting interpretations of the rule: for example, the Supreme Court only recently resolved the split between the circuits as to whether an impasse in bargaining constitutes an unusual circumstance justifying unilateral withdrawal from a multiemployer unit. *Charles D. Bonanno Linen Service v. N.L.R.B., supra,* 454 U.S. at 412–17, 102 S.Ct. at 725–27. However, the question of whether the notice to be given must actually be in writing has not, apparently, been addressed by any circuit. Most, including the Third Circuit, assume that it must, and utilize the NLRB's language *verbatim. See, e.g., N.L.R.B. v. Hayden Electric, Inc., supra,* 693 F.2d at 1363; *Andino v. N.L.R.B., supra,* 619 F.2d at 150; *Authorized Air Conditioning Co. v. N.L.R.B., supra,* 606 F.2d at 906; *N.L.R.B. v. Beck Engraving Co., Inc., supra,* 522 F.2d at 481. Even those that do not require notice in writing, emphasize the importance of the requirement that an employer not be able to withdraw from a multiemployer bargaining unit without notice to the union. As the Second Circuit has stated,

For an employer to withdraw bargaining authorization from a multiemployer association without notifying the union is not simply a breach of etiquette. Such tacit withdrawal not only withholds knowledge from the union about the composition of the bargaining unit, but also deprives it of the opportunity either to initiate independent negotiations with the withdrawing party or to file a complaint promptly with the Board.

*N.L.R.B. v. Independent Association of Steel Manufacturers, Inc., supra,* 582 F.2d at 149. Indeed, the case primarily relied upon by Fashion Associates, *see* Fashion Associates' Brief in Opposition to Motion for Summary Judgment at 13–14; Fashion Associates' Letter Brief (7/25/84) at 1–2, itself states that

to be effective as against the union, an employer's withdrawal must show an unequivocal manifestation of an intent to withdraw which must be brought to the union's attention in a timely manner.

*Pharmacists and Retail Drug Store Employees Union, Local 330 v. Lake Hills Drug Co.,* 255 F.Supp. 910, 913 (W.D.Wash. 1964). Adhering to this rule, the court in *Lake Hills* found that a union seeking to reopen negotiations, which was given a list purporting to represent the c mplete membership of the multiemployer association, was nonetheless not given adequate notice of the withdrawal of an employer not on such list. 255 F.Supp. at 913–15.

■ Even if, as Fashion Associates argues, the Supreme Court in *Bonanno* signalled an end to the requirement of written notice, by providing only that "adequate notice" is necessary, 454 U.S. at 411, 102 S.Ct. at 724, it cannot be argued that *no* notice is required. *See also Labbe v. M.W. Heroman & Co.,* 521 F.Supp. 1017, 1021–22 (M.D.La.1981) (while written notice is not required, "timely, adequate and unequivocal notice" to the union must occur). Here, it is undisputed that the only notice of Fashion Associates' withdrawal from the SAA was given to the SAA itself. Finkelstein Aff. (7/11/84) ¶ 16. Application of

the rule to such notice shows it to have been inadequate.

First, the lack of any formal notice is glaring. Fashion Associates contends that the series of events which it alleges comprised an "abrogation" of the parties' prior agreement reveals the Union's subjective understanding that Fashion Associates had withdrawn from the SAA. No other notice is claimed to have been given and the court cannot but conclude that no other notice occurred. In the absence of any legal authority for the proposition that the Union's subjective understanding of whether a contract existed affects the notice required,[2] or that Union abrogation may constitute employer withdrawal,[3] Fashion Associates' argument must fail. The uncontroverted facts demonstrate that Fashion Associates simply did not withdraw from the SAA in the manner required by law, in that the Union was not on notice of such withdrawal.

Moreover, the facts set forth by Fashion Associates bolster the conclusion that the notice given was inadequate. It is clear that the abrogation alleged was based upon the Union's attempts to end "double breasting" by organizing certain nonunion employees of Fashion Associates. Though Fashion Associates contends that this was in breach of the parties' agreement, the provision of the collective bargaining agreement allegedly breached is nowhere indicated; nor does the court believe that the union would ever have impliedly agreed to abandon all organizational efforts. In any event, the Union's efforts were, by definition, directed at employees not governed by the agreement then in effect. Indeed, far from repudiating its agreement with Fashion Associates, the Union's actions indicated an attempt to expand that relationship. Even if this behavior broke some unwritten rule governing the parties, it is difficult to understand how defendant's resistance to it would constitute notice of withdrawal from the agreement between it and those employees already unionized. Actual notice was required in a "timely, adequate and unequivocal" fashion. It did not occur.

Finally, to the extent that Fashion Associates' putative withdrawal from the SAA occurred in connection with negotiations regarding the renewal of the existing collective bargaining agreement in early 1982,[4] see Finkelstein Aff. (7/11/84) ¶¶ 12–14, even written notice would not have been adequate. Rather, at that point, either "mutual consent" or "unusual circumstances" would have been required for Fashion Associates to withdraw. Neither is claimed by Fashion Associates, or established by the facts averred. Indeed, the Union's lack of consent is apparent from its numerous subsequent efforts to enforce the agreement as against Fashion Associates. See, e.g., Id. ¶ 19.[5] And, as even an

---

2. Indeed, the *Lake Hills* case relied upon by defendant itself indicates that even actions that might have "effectively indicated" withdrawal to the Union are inadequate absent "clear, unequivocal and specific notice" of the intention to withdraw. 255 F.Supp. at 914. It thus rejects the notion of a subjective test for such withdrawal.

3. As the Union argues, the question of whether or not the Union abrogated the agreement would, in any event, be a matter for arbitration. *See, e.g., California Trucking Ass'n v. Brotherhood of Teamsters & Auto Truck Drivers,* 679 F.2d 1275, 1282 (9th Cir.1981), *cert. denied,* 459 U.S. 970, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982) ("it is now settled that the issue whether repudiation has occurred must normally be submitted to arbitration when the contract calls for arbitral resolution of questions arising under the collective bargaining agreement") (citing cases);

*Controlled Sanitation Corp. v. District 128,* 524 F.2d 1324, 1329–32 (3d Cir.1975) (citing cases). Fashion Associates does not, apparently, dispute this contention.

4. *See* Aff. of Sidney Reiff (6/22/84) ¶ 10 (negotiations for 1982–85 collective bargaining agreement commenced in early 1982).

5. The court is aware that "a union's acquiescence in or implied consent to an employer's untimely or ineffective withdrawal will excuse that employer's subsequent refusal to honor a bargaining agreement negotiated by the union and the multi-employer association." *N.L.R.B. v. Hayden Electric, Inc., supra,* 693 F.2d at 1365 (citing cases). However, even giving Fashion Associates the benefit of every favorable inference, it has submitted no evidence that the Union intended to meet and negotiate separately

impasse, followed by a strike or an interim agreement with an individual employer, do not comprise the "unusual circumstances" justifying unilateral withdrawal subsequent to the commencement of negotiations, *Bonanno, supra,* 454 U.S. at 412–17, 102 S.Ct. at 725–27, it is difficult to accept that a threat to organize, apparently set forth in the context of a renegotiation of the parties' relationship, can constitute unusual circumstances. Indeed, such is the content of any renegotiation.

The NLRB rule promulgated in *Retail Associates, Inc.* and adopted by the courts has a salutary effect which Fashion Associates here attempts to undermine. The rule recognizes that "[m]ultiemployer bargaining has continued to be the preferred bargaining mechanism in many industries," *Bonanno, supra,* 454 U.S. at 410, 102 S.Ct. at 724, and "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *N.L.R.B. v. Truck Drivers Local Union No. 449,* 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957).

> It neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining. At the same time, it [seeks] to further the utility of multiemployer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw.

*Bonanno, supra,* 454 U.S. at 412, 102 S.Ct. at 725. In general, the rule reflects "an increasing emphasis on the stability of multiemployer units." *Id.* at 410, 102 S.Ct. at 724. It is this stability, as well as the fairness provided by adequate notice, which is at stake in a case such as this: parties ought not be able to withdraw from multiemployer bargaining situations in a manner disadvantageous to one party, either by virtue of poor timing or inadequate notice.

Moreover, to adopt Fashion Associates' suggestion that the adequacy of the notice given turns on a party's subjective evaluation thereof would be to negate the advantages of clarity and administrability inherent in such rule. Whether actual notice, written or otherwise, has been given is a relatively simple and straightforward matter; assessing the parties' respective beliefs engenders a far more problematic inquiry. *Cf., Ruefenacht v. O'Halloran,* 737 F.2d 320, 332–33 (3d Cir.1984) ("uncertainty of application" "benefits neither the parties nor the court . . ."). Nor, finally, should a court lightly disregard a rule set forth by an administrative agency such as the NLRB, which as the *Bonanno* Court observed with respect to this particular rule, "evolved and [is] still evolving, as the Board, employing its expertise in light of experience, has sought to balance the 'conflicting legitimate interests' in pursuit of the 'national policy of promoting labor peace through strengthened collective bargaining.'" 454 U.S. at 413, 102 S.Ct. at 725, quoting *N.L.R.B. v. Truck Drivers, supra,* 353 U.S. at 95, 96, 77 S.Ct. at 647.

For all of the above reasons, the court finds that Fashion Associates did not give the required notice to the Union that it was withdrawing from the SAA and thus, is bound by the collective bargaining agreement between the Union and the SAA which went into effect on June 1, 1982. The consequences of this finding are as follows:

First, the Union's motion for partial summary judgment will be granted.

Second, the matter will, under the applicable provisions of the collective bargaining agreement, be referred to arbitration, and Civil Action No. 84–1449 will be stayed pending the arbitrator's adjudication of this

---

with Fashion Associates. *See I.C. Refrigeration Service,* 200 NLRB 687, 690 (1972), cited in *Hayden Electric, supra,* 693 F.2d at 1365–66. Indeed, Fashion Associates contends only that it offered "to negotiate a change in [the parties'] long-standing relationship," Finkelstein Aff. (6/11/84) ¶ 14, but not that the Union accepted such offer. Thereafter, the Union continued to

assert its rights under such agreement, *id.* ¶ 19, including in the within litigation commenced on October 5, 1983 and the arbitration at issue, conducted earlier. Nor, without more, does the Union's failure to remit vacation pay to Fashion Associates' employees in 1983 give rise to any inference that the Union recognized Fashion Associates' withdrawal from the SAA.

matter.[6]   *See, e.g., Bechtel Corp. v. Local 215, Laborers' International Union,* 544 F.2d 1207, 1215 (3d Cir.1976) (stay of action pending arbitration appropriate because within trial court's discretionary power, and where arbitration may obviate the need for trial).   Hence, Fashion Associates' renewed motion to enjoin arbitration on the basis of the existence of a contract is denied.

■   Third, because Fashion Associates did not properly withdraw from the SAA, it remained bound by the Association's decisions.   *See, e.g., N.L.R.B. v. Teamsters Union Local No. 378,* 672 F.2d 741, 744 (9th Cir.1982) (agreement to participate in multiemployer bargaining "is an expression of the degree to which an employer is bound by the contracts negotiated by the unit").   One of these decisions was to utilize Marshall Rosenberg as arbitrator, a choice made despite Mr. Rosenberg's known past affiliation with the International Ladies' Garment Workers' Union, as a partner in a law firm which had represented various I.L.G.W.U. locals.   Cert. of Bennet D. Zurofsky (6/11/84), Exh. A. at 25–32; Aff. of Sidney Reiff (6/22/84) ¶ 9.[7]   Indeed, Mr. Rosenberg was not only reappointed to his

position as arbitrator in the 1982 agreement here under dispute, Reiff Aff. ¶ 10, but had also been appointed in 1978, and reappointed in 1979, years as to which there is no dispute regarding Fashion Associates' membership in the SAA. *Id.* ¶¶ 8–9. *See also* Aff. of Jerome Finkelstein (6/11/84) ¶¶ 6, 7, 11; Finkelstein Aff. (4/11/84) ¶ 5.   Each of these appointments occurred despite the knowledge of SAA officers of Mr. Rosenberg's past affiliations. Reiff Aff. ¶¶ 8–10.   Indeed, the current Executive Director of the SAA states not only that he has "always found Marshall Rosenberg to be scrupulously fair and impartial, and that he makes his decisions and fashions his awards with faithfulness to the governing collective bargaining agreement," but also claims that Mr. Rosenberg's past experience makes him a better, more efficient and more knowledgeable arbitrator in what is "a unique and very complex industry." *Id.* ¶ 11. *See also* Certif. of Bennet D. Zurofsky (6/11/84), Exh. E (list of multiemployer collective bargaining agreements, etc., for which Marshall Rosenberg serves as arbitrator).[8]   Hence, the decision of the SAA to

---

**6.** The Union's motion to dismiss the injunctive aspects of Fashion Associates' complaint, all of which attempt to enjoin arbitration, is therefore moot.

**7.** This affiliation was also disclosed during the arbitration proceedings currently ongoing.   The transcript of such proceedings reveals an extremely complete disclosure of Mr. Rosenberg's past affiliations, which do not include any New Jersey locals of the I.L.G.W.U., as well as the circumstances surrounding his appointment. *See* Zurofsky Certif. (6/11/84), Exh. A.

**8.** Indeed, as the Union argues, "[t]he most sought-after arbitrators are those who are prominent and experienced members of the specific community in which the dispute to be arbitrated arose....   To vacate an arbitration award where nothing more than an appearance of bias is alleged would be 'automatically to disqualify the best informed and most capable potential arbitrators.'" *International Produce, Inc. v. A/S Rossharet,* 638 F.2d 548, 552 (2d Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), quoting *Commonwealth Coating Corp. v. Continental Casualty Co.,* 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968)

(White, J., concurring). *See also Merit Insurance Co. v. Leatherby Insurance Co.,* 714 F.2d 673, 679 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983) ("there is a tradeoff between impartiality and expertise").   Marshall Rosenberg is apparently one of those arbitrators; application of varying standards and factual situations to him has thus yielded mixed results. *Compare Cristina Blouse Corp. v. International Ladies Workers' Union, Local 162,* 492 F.Supp. 508, 510 (S.D.N.Y.1980) (disqualifying Rosenberg where employer never read SAA agreement) *and Local 140, International Ladies' Garment Workers' Union. P.C.R. Sportswear Corp.,* 488 F.Supp. 412, 414–15 (S.D.N.Y.1980) (refusing to disqualify Rosenberg where employer association agreed to utilize him as arbitrator).   A choice between the "evident partiality" and "appearance of bias" standards currently debated, *see, e.g., International Produce, Inc., supra,* 638 F.2d at 551–52 (adopting evident partiality standard and rejecting disqualification solely on the basis of appearance of bias) is not, of course, necessary here, where Fashion Associates has consented to the utilization of Rosenberg as arbitrator.   However, in any event, Rosenberg has not demonstrated the bias which Fashion Associates attributes to him: his alleged

utilize Mr. Rosenberg's services, was made with the Association's full knowledge of the advantages and disadvantages of such appointment. It is a decision thus in accord with the notice requirement of *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 149, 89 S.Ct. 337, 339, 21 L.Ed.2d 301 (1968), and one to which Fashion Associates, as an SAA member, was bound. *See, e.g., Garfield & Co. v. Wiest*, 432 F.2d 849 (2d Cir.1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (197 ); *Merritt-Chapman & Scott Corp. v. Penn. Turnpike Comm.*, 261 F.Supp. 1, 7–8 (M.D.Pa.1966), *aff'd*, 387 F.2d 768 (3d Cir.1967). Therefore, Fashion Associates' motions to vacate the underlying default judgment,[9] and to enjoin arbitration on the basis of Mr. Rosenberg's bias, are each denied, and the Union's motion for partial summary judgment as to Mr. Rosenberg's bias is rendered moot.

There remain two minor matters requiring the court's attention. First, Fashion Associates has moved to disqualify the Union's counsel from further participation in these lawsuits. This motion is based upon Fashion Associates' allegation that counsel is in a position where they will be required to act as witnesses herein. In particular, Fashion Associates contends that counsel will have to testify as to the origin of an April 25, 1984 letter modifying the collective bargaining agreement between the Union and the SAA, in order to add a clause inadvertently omitted previously; it is Fashion Associates' position that such letter resulted from the work of Union counsel. Additionally, Fashion Associates claims that Union counsel will have to testify as to their prior knowledge of Mr. Rosenberg's bias, as well as to certain alleged *ex parte* communications with Rosenberg. Finally, Fashion Associates points to factual averments made by Union counsel in affidavits, and argues that these statements warrant disqualification. *See* Finkelstein Aff. (5/29/84) ¶ 41.

Each of these contentions is utterly lacking in merit. First, the court has already addressed the April 25, 1984 modification of the collective bargaining agreement, holding that the Union was correct "that there is overwhelming evidence that [the] reporting requirements [contained in such modification], which had existed in the prior collective bargaining agreement from which the parties were working at the time the Consent Order was entered into, and which are implied by other express sections of the Collective Bargaining Agreement, were clearly contemplated by the language of the Order." *Local 145, International Ladies' Garment Workers' Union v. Fashion Associates, Inc.*, Civil Action No. 83–3738, unpub. op. at 4–5 (D.N.J. June 13, 1984) ("*Opinion*"). Counsel's representations concerning this modification, including that regarding the parties' understanding of what was being agreed to with respect to the Consent Order entered March 13, 1984, Zurofsky Certif. (6/4/84) ¶¶ 4–6,[10] is thus no longer at issue in this litigation. It may, of course, be at issue in

---

*ex parte* contact with the Union was due to the fact that Fashion Associates sued both Rosenberg—despite his arbitral immunity—and the Union, and the two were forced to convene in order, properly, to effectuate a removal to this court. *See* Finkelstein Aff. (5/29/84) ¶ 24(D). Similarly, Rosenberg's alleged partiality in allowing the Union to sign his name to subpoenas and merely send them out, while requiring Fashion Associates to submit its subpoenas of witnesses for approval, *id.* ¶ 25, ignores the facts of the case: a transcript of the proceedings before Mr. Rosenberg demonstrates that Fashion Associates could have availed itself of the former procedure and simply chose not to. Zurofsky Certif. (6/11/84), Exh. C. Once Fashion Associates submitted such subpoena to Rosenberg, he exercised his discretionary powers to conform such subpoenas to the requirements of relevancy and materiality. Hence, Fashion Associates has failed to show any evident partiality on the part of the arbitrator whom it chose.

9. Vacating a judgment is, in light of "the social interest in the finality of litigation," "an extraordinary remedy" and should only be granted in cases such as these where the moving party shows "not only that an arbitrator had violated the ethical and legal standards for arbitrators but that the violation created a substantial danger of an unjust result." *Merit Insurance Co., supra*, 714 F.2d at 682–83.

10. The averments of this affidavit are uncontroverted, and thus, not grounds for disqualification. *See* DR 5–101(B)(1).

the arbitration, but in that event, it should be raised there, and decided by the arbitrator to whom this matter has been referred.

Second, counsel's knowledge of Mr. Rosenberg's bias also does not warrant the disqualification of counsel, as the court has already ruled that such bias, even if it exists, is rendered irrelevant by the SAA's choice of Mr. Rosenberg, a choice to which Fashion Associates is bound. *See supra* at 83–84. Nor, as the court has noted, does the *ex parte* contact between the Union and Rosenberg, caused by Fashion Associates having sued both, give rise to any reason for disqualification under the disciplinary rules.

Finally, while Fashion Associates is correct that the affidavits of counsel are not always the optimal way to establish facts, the court does not find the affidavits of Mr. Zurofsky to have gone beyond the permissible scope of DR 5–101(B)(2), which allows such affidavits to "relate solely to a matter of formality [as to which] there is no reason to believe that substantial evidence will be offered in opposition ...." [11] It is true that the papers of both sides have been vitrolic and combative in tone, and, indeed, the court would prefer that this litigation be characterized throughout by greater moderation and congeniality. However, the argumentative nature of counsel's affidavits, while not deserving of approbation, also does not warrant disqualification, especially in light of the hardship that would thus be worked upon the Union, which has apparently been represented by the same firm for fifty years, and throughout this litigation throughout. *See* DR 5–102(A), citing DR 5–101(B)(4). Nor is there any evidence that Union counsel will testify contrary to the interests of their client, DR 5–102(B); in this situation the rule ought not be allowed "to permit a lawyer to call

opposing counsel as a witness and thereby disqualify him as counsel." *Kroungold v. Triester*, 521 F.2d 763, 766 (3d Cir.1975), quoting DR 5–102(B), fn. 31. Fashion Associates' motion to disqualify counsel is denied.

Finally, Fashion Associates' motion for reconsideration of the court's Opinion and Order of June 13, 1984 is also denied. Such motion is based primarily upon two grounds. First, Fashion Associates argues that because the Consent Order found to have been violated constituted a settlement, and because the Union breached that agreement by bringing Fashion Associates to arbitration rather than bargaining in good faith, Fashion Associates should have been excused from performance of such settlement. This position demonstrates an arrogant disregard for the fact that, as the court stated, "[v]iolation of a consent order, such as the one at issue, is no less subject to contempt than that of an order not arrived at by consent." *Opinion* at 7, citing *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 97 (3d Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Moreover, the notion that it is the Union, rather than Fashion Associates, that has been acting in bad faith is belied by the facts of this case: not only has Fashion Associates defaulted twice and been found in contempt once, but it was given an opportunity to bargain with the Union prior to the Union's invocation of the contractual right to arbitration. *See* Finkelstein Aff. (5/29/84), Exh. B. Fashion Associates was bound by the Consent Order filed March 13, 1984 until that Order was vacated or modified. *See Opinion* at 7. It could thus be held in contempt, as it was for failure to comply with the terms of the Order.

11. Such, for example, is the nature of Mr. Zurofsky's June 4 affidavit condemned by Fashion Associates in Mr. Coplon's letter of June 12, 1984. However, the Zurofsky affidavit there complained of discusses uncontroverted facts regarding the conduct of this litigation, and not the underlying merits thereof. It also is used to make various documents properly a part of the record, a standard procedure not challenged by Fashion Associates.

It should also be noted that, while Fashion Associates' position is consistently set forth by Mr. Finkelstein, his affidavits are not always properly based upon personal knowledge. *See, e.g.,* Finkelstein Aff. (5/29/84) ¶ 24 (regarding arbitration not attended by Mr. Finkelstein).

86

Second, Fashion Associates now claims that the court's finding that the Union had not been granted access to a single record of Fashion Associates was in error, and claims that such records were in fact turned over. Finkelstein Aff. (6/25/84) ¶ 6. This is the first time such claim is made. *See Opinion* at 5. However, in any event, the court based its contempt finding on Fashion Associates' failure to comply with the Order in other respects as well—for example, for failure to submit certain other records clearly contemplated by the Order. *See Opinion* at 8. That finding was entirely appropriate in light of the evidence then adduced, evidence which continues to persuade the court of Fashion Associates' contumacious disregard of its Order. The motion for reconsideration is denied.

The Union should submit an order in conformity with this Opinion.